448 A.2d 6

**Samuel DUNLAP.**

**v.**

**PHILADELPHIA NEWSPAPERS, INC., Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 6, 1981.

Filed July 2, 1982.

Petition for Allowance of Appeal Denied Sept. 30, 1982.

476

Samuel E. Klein, Philadelphia, for appellant.

Milton A. Lazaroff, Philadelphia, for appellee.

Before SPAETH, BECK and LIPEZ, JJ.

SPAETH, Judge:

This action for defamation was brought by appellee, a sergeant in the Philadelphia Police Department, against appellant, publisher of *The Philadelphia Inquirer*. It is based on an article in the *Inquirer* concerning police corruption. The jury awarded appellee both compensatory and punitive damages. Appellant's motion for judgment n. o. v. or new trial was denied. We have concluded that judgment n. o. v. should have been entered because appellee failed to prove that appellant published the article with "actual malice" or "reckless disregard of the truth," as required by *New*

*York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[1] We therefore reverse.

■ In reviewing the denial of a motion for judgment n. o. v., we must view the evidence in the light most favorable to the verdict-winner. Only evidence supporting the verdict may be considered, with the rest being rejected. All conflicts in the evidence are to be resolved in favor of the verdict-winner, or appellee.[2] *Kiely v. Southeastern Pennsylvania Transportation Authority,* 264 Pa.Superior Ct. 578, 401 A.2d 366 (1979); *Grubb v. Albert Einstein Medical Center,* 255 Pa.Superior Ct. 381, 387 A.2d 480 (1978). Thus viewed, the evidence was as follows:

The article at issue is introduced by a headline that runs the entire width of the *Inquirer's* front page and states, in one large banner, "Wide Police Corruption Revealed." Reproduced Record at 563a. Immediately beneath the headline are two smaller headlines, side-by-side, the one on the left stating, "Patrol Outside, Gambling Inside," the one on the right, "Hidden Cameras Confirm Reports of Payoff System." Two large photographs are beneath the "Patrol Outside, Gambling Inside" headline. The larger photograph, about seven inches square, shows a man placing his hand inside a police car marked "17B." The caption to this photograph reads, "Sergeant's Car 17B Stops Outside Known Gambling Location." The article itself, entitled "We Watched Gambling Spot Until Policemen Nabbed Us", begins immediately beneath the photograph of car 17B. It

1. The parties agree, as they must, that appellee is a public official and is therefore held to the standard of proof set forth in *New York Times Co. v. Sullivan, supra.*

2. Appellant asks us to "make an independent examination of the whole record," Appellant's Brief at 11, since, in addition to judgment n. o. v., it is also seeking a new trial on the argument that the verdict was against the weight of the evidence. It is true that the standard of review is different depending on whether judgment n. o. v. or a new trial is sought. *Ditz v. Marshall,* 259 Pa.Superior Ct. 31, 393 A.2d 701 (1978). Here, we have used the judgment n. o. v. standard, for appellant is primarily seeking a judgment n. o. v. Appellant's Brief at 41 ("The record in this action demonstrates that defendant is entitled to a judgment n. o. v., and at the very least, to a new trial.")

describes the "stake-out" conducted by two Inquirer reporters and elaborates on the meaning of the photograph as follows:

We arrived at the location at about 4 P.M. and found the streets empty except for several late model luxury cars parked in the area and one man with grey sideburns and a white shirt pacing the block in front of the rowhouse.

Later, other men talked with the older man and then entered the rowhouse.

At 5:47 P.M., car 17B drove up Wharton st. and turned left onto 36th st., directly below us. The man, who appeared to be in his late 50s or early 60s, walked out into the street, leaned on the driver's side, and reached into the squad car through an open window.

At 5:51 P.M. the car left.

CALLS STATION

We called the 17th District police station and asked who was driving car 17B that day and was told it was occupied by Sgt. Samuel Dunlap.

\*    \*    \*    \*    \*    \*

On Monday I and another reporter went to the 17th District headquarters to show Sgt. Dunlap the photos and to question him about his activities on the afternoon of Sept. 12.

Dunlap, a tall, thin-faced officer with a ruddy complexion, greeted the reporters and sat with them in an interrogation room.

Asked if he was driving car 17B that day, he said, "more than likely."

Asked if he could identify the man leaning into his squad car, Dunlap laughed and said, "Oh sure—that's Hubba Hubba.

'TOWN DRUNK'

"He's the local town drunk. He's always acting like he's directing traffic. I heard he just died. Wait, I can get you his real name. We call him Hubba Hubba—he's been picked up a million times for intoxication."

Dunlap then identified the man as Vincent Wileczyk, 56, of 3618 Wharton st.

Before Dunlap could be asked any more questions, he took the photographs and showed them to the acting district commander, William Scott.

Scott then motioned myself and the other reporter to his room and said, "I would appreciate if you want to talk to my policemen that you see me first.

"First of all, let's see some identification."

After showing Scott press cards, one reporter asked if Sgt. Dunlap could stay while the photographs were discussed. Scott refused and told Dunlap, "Go back out on the street."

Told that we had talked to Dunlap calmly for several minutes, Scott said, "Well, I'm sorry he did that. I wouldn't have given you any information at all regarding my personnel."

Scott refused to give any further information, but persistently asked us, "What is your purpose?"

When I said The Inquirer was investigating gambling at the Wharton street address, Scott said he had no reports of gambling at that location.

When told also that the Inquirer was investigating reports of police payoffs in the area, the captain put his arms forward touching the desk, leaned back in his chair and stood up.

"I haven't had any reports of payoffs—Do you want to make a complaint?" Scott asked.

"No," a reporter said. "I want to talk to Dunlap or ask you about Dunlap."

Scott responded, "I'm flatly telling you I will not allow you to ask my policemen any questions."

The evidence of "actual malice," which was essentially uncontroverted, was as follows:

The reporter who wrote the article, Kent Pollack, testified that he had called the police station after the surveillance had taken place to find out who had been in car 17B at the

time and was told by whoever answered the telephone that it was appellee. N.T. 6/7/79, 255, N.T. 6/8/79, 331–332. Although Mr. Pollack did obtain this information by pretending to be someone who "wanted to write a letter to the police commissioner to commend" appellee, N.T. 6/7/79, 255, he testified that this ruse had been used during the newspaper's series on police corruption for three months, *id.* 254.

Mr. Pollack also testified that after his telephone call to the police station, he met with Police Commissioner O'Neill to verify the identity of the officer in car 17B. N.T. 6/7/79, 331–332. However, the Commissioner refused to talk to him or to give him any information. *Id.* This was corroborated by Acel Moore, who accompanied Mr. Pollack on this interview. N.T. 6/8/79, 308–9.

Ray Holton served as "legman" and his job was to verify the information in the article to be written by Mr. Pollack. N.T. 6/7/79, 284. He testified that he was not satisfied with the telephone identification of the officer in car 17B, and decided to interview appellee. N.T. 6/7/79, 266. He was accompanied on this interview by Mr. Moore, whose job it was to act as "back-up" and to take notes of what was said to insure accuracy in reporting. N.T. 6/7/79, 267 (testimony of Holton). Mr. Moore testified that this was a policy of appellant's and that he had performed this role on other occasions. N.T. 6/8/79, 303. Both Mr. Holton and Mr. Moore testified that they showed the photograph, which later appeared in the newspaper, to appellee and asked him if he was in the car at the time the photograph was taken. N.T. 6/7/79, 272, 281 (Holton), N.T. 6/8/79, 305 (Moore). Both testified that appellee answered, "More than likely." *Id.* Both testified that appellee was asked to double-check this information from police logs, but that when he left to do so, the interview was interrupted by Captain Scott, N.T. 6/7/79, 274, 281, 284–85 (Holton), N.T. 6/7/79, 313 (Moore), who was upset and ordered appellee to leave the room, so that the interview was ended. N.T. 6/7/79, 278–9, 281 (Holton), N.T. 6/8/79, 313 (Moore).

–I–

The first issue we must decide, as the threshold issue in an action for defamation, is whether the article published in the *Inquirer* could be understood as defamatory. It was the function of the lower court, in the first instance, to make this decision. If the court decided that the article could be understood as defamatory, then it became the jury's function to decide whether it was so understood by those who read it. *Corabi v. The Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971); *Brophy v. Philadelphia Newspapers Inc.*, 281 Pa.Superior Ct. 588, 422 A.2d 625 (1980).

A publication is defamatory if it "tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injury him in his business or profession." *Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 317, 182 A.2d 751, 753 (1962). In our view, it is beyond question that the article published in the *Inquirer* could be understood as defamatory. As we have described above, the article ran beneath a large photograph of a sergeant's squad car, which in turn appeared beneath a banner headline reading "Wide Police Corruption Revealed." If appellee were the sergeant in the car, and the article says this was "more likely than not," then the meaning conveyed by the article was that the photograph depicted appellee accepting a bribe, which would at the very least tend to injure appellee in his profession. *See Brophy v. Philadelphia Newspapers Inc., supra* (article suggesting that police commissioner and police officers shot and killed son of police chief as part of vendetta.[3] *Compare Martin v. Municipal Publications*, 510

---

**3.** We note that the meaning of an allegedly defamatory communication can only be understood when the communication is read in context. *Corabi v. The Curtis Publishing Co., supra.* Therefore, the context of the article here properly includes its headline. *See Brophy v. Philadelphia Newspapers Inc., supra* (headline could lead reader to believe that feud was cause of shooting). The Restatement (Second) of Torts stresses the importance of the headline in determining the meaning of a newspaper article:

Circumstances in various types of situations determine the extent of the context of the imputation complained of. Thus, the text of a newspaper article is ordinarily not the context of the headline,

F.Supp. 255 (E.D.Pa.1988) (photograph, article and caption capable of defamatory meaning under Pennsylvania law), *with Fogel v. Forbes*, 500 F.Supp. 1081 (E.D.Pa.1980) (photograph and caption not defamatory under Pennsylvania law).

■ As to whether the article was understood as defamatory by those who read it, appellee argues that "[t]he evidence produced at trial was more than sufficient for the jury to conclude that the average person who read the article construed it to mean that Sergeant Dunlap was in Car 17–B and was receiving a bribe or payoff." Appellee's Brief at 16. We agree, although, to be precise, appellee should have said, "the *reasonable* person who read the article," instead of "the average person."[4]

–II–

Appellant argues that it may not be held liable because "the article reported only the undisputed and true facts." Appellant's Brief at 13. However, appellant does not discuss who had the burden of proving the truth or falsity of the article, and we think it important to resolve this issue before we discuss whether the article did report only undisputed and true facts.

> although it may explain or qualify a defamatory imputation conveyed when the headline alone is read. This is true because the public frequently reads only the headlines of a newspaper or reads the article itself so hastily or imperfectly as not to realize its full significance.
> Restatement (Second) of Torts § 563, Comment d.

**4.** Since we do not believe an intentional defamation is involved here, *see* Part III, but rather an unintentional defamation, the test is an objective test—what a reasonable recipient would have understood from the article. As the Restatement explains:
> [I]t is not enough that the particular recipient of the communication actually attaches a defamatory meaning to it. If the defamatory meaning is not intended, it must be a reasonable construction of the language. Thus the fact that a person who is prone to think evil of others, hearing words obviously intended to be innocent, by an unreasonable construction attaches to them a derogatory meaning, does not render the language defamatory.
> Restatement (Second) of Torts § 563, Comment c.

484

--A--

■ The issue whether in a defamation action the plaintiff has the burden of proving the falsity of the publication or the defendant the burden of proving its truth has recently been before the United States Supreme Court, but it was not decided. *Wilson v. Scripps-Howard Broadcasting Co.*, 642 F.2d 371 (6th Cir.) *cert. granted*, 454 U.S. 962, 102 S.Ct. 500, 70 L.Ed.2d 377 (1981), *cert. dismissed pursuant to Rule 53*, 454 U.S. 1130, 102 S.Ct. 984, 71 L.Ed.2d 119 (1982). The practice in Pennsylvania has been to place the burden of proving truth on the defendant, but the continued validity of this practice has been questioned. *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 274–5 n. 49 (3rd Cir. 1980).[5]

The common law rule has been that the defendant has the burden of proving truth as an affirmative defense. Professor Prosser explains the rule by saying that "[o]ut of a tender regard for reputations, the law presumes in the first instance that all defamation is false, and the defendant has the burden of pleading and proving truth." Prosser, Law of Torts § 116 (1971) (footnotes omitted). Our Supreme Court has consistently followed this rule:

Nevertheless, although ordinarily in order to be actionable words must be false, falsity is *not* an element of a cause of action for libel in Pennsylvania. Rather, the opposite of falsity, truth, is a complete and absolute defense to a civil

---

**5.** The court in *Steaks Unlimited* suggested, without deciding, that placing the burden of proving truth on the defendant was unconstitutional:

Pennsylvania's placement of the burden of proving the truth of the communication on the defendant, *Corabi v. Curtis Publishing Co.*, 441 Pa. at 449–50, 273 A.2d at 908–09, would appear to be contrary to the constitutional limitations on state libel law enunciated by the Supreme Court. *See e.g., Gertz*, 418 U.S. at 347 n. 10, 94 S.Ct., at 3010 (rejecting Justice White's view that it would be constitutional for a state to require libel defendants to prove the truth of an allegedly defamatory statement); *New York Times*, 376 U.S. at 271, 84 S.Ct. at 721 ("Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth . . . and especially one that puts the burden of proving truth on the speaker.").
*Steaks Unlimited, Inc. v. Deaner, supra* at 274–75.

action for libel ... And the burden of proving the same rests upon the defendant.

*Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 450, 273 A.2d 899, 908 (1971) (footnotes omitted).

*Accord, Schonek v. WJAC, Inc.*, 436 Pa. 78, 258 A.2d 504 (1969); *Badami v. Dimson*, 226 Pa.Superior Ct. 75, 310 A.2d 298 (1973). *See Lowenschuss v. West Publishing Co.*, 542 F.2d 180 (3d Cir. 1976) (Pennsylvania law); *Keddie v. Pennsylvania State University*, 412 F.Supp. 1264 (M.D.Pa.1976) (*ibid.*); *Fram v. Yellow Cab Co. of Pittsburgh*, 380 F.Supp. 1314 (W.D.Pa.1974) (*ibid.*).[6]

However, as noted by the Third Circuit, the constitutionality of placing the burden of proving truth on the defendant has been called into question by the decision of the United States Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Gertz*, the Court said, "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347, 94 S.Ct. at 3010 (footnote omitted). Because the reason for placing the burden of proving truth on the defendant is that falsity is presumed, it has been urged that the common law rule does precisely what *Gertz* forbids: it holds a defendant strictly liable in a case where truth cannot be proved. *See* Sack, *Libel, Slander, and Related Problems*, 135 (1980) (*citing Corabi v. Curtis Publishing Co., supra,* as the only case placing burden on defendant).

Given this state of the law, we have a choice. We might follow *Corabi v. Curtis Publishing Co., supra,* and hold that

6. This rule has been codified by the Act of Aug. 21, 1953, P.L. 1291, now at, P.L. 586, Act. No. 142, 42 Pa.C.S.A. § 8343 (1981 Pamphlet) which reads in pertinent part:
   (b) Burden of defendant—In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:
      (1) The truth of the defamatory communication.

appellant as defendant had the burden of proving truth. But we do not think we should do that.[7]

In *Moyer v. Phillips*, 462 Pa. 395, 396, 341 A.2d 441 (1975), the Court considered whether a statute providing that all causes of action, except for libel and slander, would survive the death of any of the parties was a denial of equal protection. Finding the distinction between causes of action for libel and slander and other causes of action arbitrary, the Court held the statute unconstitutional. In a concurring opinion, Justice ROBERTS, joined by Justice NIX, said:

> At common law, the defendant in a defamation action might be faced with a substantial burden of proof.
>
> "In an action for defamation, the plaintiff's prima facie case is made out when he has established a publication to a third person for which the defendant is responsible, the recipient's understanding of the defamatory meaning, and its actionable character. It is then open to the defendant to set up various defenses, which to some extent have moderated the rigors of the law of libel and slander. Two of these—privilege and truth— are complete defenses, avoiding all liability when they are established."
>
> W. Prosser, Law of Torts § 114, at 776 (1971) (footnote omitted); see id. § 116, at 798. To establish a qualified privilege, the defendant would be required to show his own good faith or lack of "malice." Id. § 115, at 794–95.

7. The Restatement points out that the common law rule has been "eroded":

> At common law the majority position has been that although the plaintiff must allege falsity in his complaint, the falsity of a defamatory communication is presumed. It has been consistently held that truth is an affirmative defense which must be raised by the defendant and on which he has the burden of proof. The practical effect of this rule has been eroded, however, by the recent Supreme Court holdings that the First Amendment to the Constitution requires a finding of fault on the part of the defendant regarding the truth or falsity of the communication. Pending further elucidation by the Supreme Court, the Institute does not purport to set forth with precision the extent to which the burden of proof as to truth or falsity is now shifted to the plaintiff.
>
> Restatement (Second) of Torts § 581A, Comment b.

Under this scheme, the focus of litigation in a defamation suit was normally on the issues where the burden of proof rested with the defendant: truth and privilege. Especially as to the latter, where proof of the defendant's state of mind would frequently be crucial, the testimony of the defendant would be peculiarly necessary. This unique combination of a heavy burden of proof on the defendant with a peculiar need for the testimony of the defendant would render it much more difficult for a decedent's estate to defend a defamation action than to defend most other actions. Consequently, the General Assembly, when balancing the equities of allowing or not allowing survival, could reasonably determine that the unusually heavy burden of defending a defamation action against a deceased defendant justified singling out that cause of action to abate with the death of the defendant. Since the classification thus bore a "fair and substantial relationship" to a proper legislative objective, I conclude that it did not deny equal protection to plaintiffs in defamation actions so long as the special circumstances justifying the classification continued.

However, a substantial change in the law of defamation was wrought by the decision of the United States Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). That case held that, as a matter of constitutional law, liability for defamation may not be imposed without some showing of fault, amounting at least to negligence, on the part of the defendant. Id. at 345, 94 S.Ct. at 3010; see Restatement (Second) of Torts §§ 580A, 580B (Tent. Draft No. 21, 1975). This change drastically shifts the burden of proof in defamation actions and thereby reduces the unusually heavy burden heretofore placed on defendants in such actions. In proving the necessary element of fault to make out his cause of action, the plaintiff will necessarily have to prove facts that would ordinarily negate the existence of a conditional privilege. Id. Topic 3, Special note, at 46-47. Similarly, as a practical matter, the plaintiff will find it necessary to prove the falsity of the

statement in order to establish the necessary element of fault; to this extent, the defendant is relieved of the burden of proving truth as a defense. Id. § 582, comment b., & § 580B, comment i.

In my judgment, this radical reallocation of the burden of proof in defamation actions has sufficiently removed the special burdens of defending such an action brought against a deceased defendant as to negate the prior justification for the challenged provision of section 3371. *Id.*, 462 Pa. at 405–408, 341 A.2d at 446 (footnotes omitted).[8]

In our opinion *Moyer* undermines *Corabi* and its progeny, in both the Pennsylvania and federal courts. Moreover, we are persuaded that the plaintiff should have the burden of proving falsity for the reasons so carefully explained by Judge MERRITT, writing for the Sixth Circuit in *Wilson v. Scripps-Howard Broadcasting Co., supra* :

The same rule requiring the plaintiff to prove falsity is required under the First Amendment in libel cases based on negligence or some other standard of fault of lesser magnitude than malice. The Supreme Court in stating that "demonstration that an article was true would seem

**8.** One commentator has cited *Moyer* as an example of a state court's express recognition of post-*Gertz* burdens of proof:

Before 1964, truth was a "defense" in defamation cases—which meant that falsity would be assumed unless the defendant pleaded affirmatively that his aspersion was true and then came forward at the trial with evidence of its truth. Once all the proof was in, the defendant had the burden of convincing the court that the disparagement was true. The revolution changed all this: the United States Supreme Court has, by implication, allocated an issue of falsity to the plaintiff by holding that plaintiffs have no cause of action unless they establish the defendants' fault. Public officials or public persons are required by *Times* and *Walker* to establish *Times* malice; and private persons are required by *Gertz* to establish at least negligence. These constitutional burdens requiring plaintiffs to demonstrate the defendants' fault make no sense unless the plaintiff shows that the disparagement was untrue. Statements of defamatory truth are not actionable as either libel or slander. Some state courts have expressly recognized this constitutional reallocation of the burdens on the truth issue [footnote citing *Moyer*, omitted].
*Morris on Torts* 350 (2d ed. 1980).

to preclude finding the publisher at fault," *Time, Inc. v. Firestone*, 424 U.S. 448, 458, 96 S.Ct. 958, 967, 47 L.Ed.2d 154 (1976), has suggested that falsity is an element of fault in defamation cases. In defamation actions brought by private persons against media defendants, Tennessee has defined a standard of fault based on negligence:

> [T]he appropriate question to be determined from a preponderance of the evidence is whether the defendant exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it.

*Memphis Pub. Co. v. Nichols*, 569 S.W.2d [412] at 418 [Tenn.]. It would ordinarily be impossible to determine whether the defendant exercised reasonable care and caution in checking on the truth or falsity of a statement without first determining whether the statement was false. The publisher's carelessness must have caused an error in accuracy, an error in failing to ascertain that the defamatory statement was false. The two elements of carelessness and falsity are inevitably linked, for a defendant should not be liable if it "took every reasonable precaution to insure the accuracy of its assertions." *Gertz, supra*, 418 U.S. at 346, 94 S.Ct. at 3010. Fault then must be held to consist of two elements: carelessness and falsity.[1]

In order for the jury to decide the issue of fault, it must weigh together and balance the facts concerning falsity and the facts concerning carelessness. The degree of uncertainty in the juror's mind on the issue of truth and the degree of uncertainty on the issue of carelessness must be taken into account at the same time in arriving at a conclusion on the issue of fault. Fairness and coherent consideration of the issue lead us to the conclusion that the party with the burden of proving carelessness must also carry the burden of proving falsity as a part of the concept of fault.

In addition, a rule that places the burden of proving truth on the defendant permits the imposition of liability

without fault in certain situations. "[W]hen the trier of fact is unable to determine the truth or falsity of a proposition of fact, he must render his decision against the party having the burden of proof. Consequently, in a jury trial the judge by allocating the burden of proof decides each issue of fact which the jury is unable to decide." E. Morgan, *Some Problems of Proof Under the Anglo-American System of Litigation* 70–71 (1956). When the jury is uncertain on the issue of the truth or falsity of the statement, as it may have been in the present case, it must find in favor of the plaintiff. A presumption of falsity thus permits liability without fault in the close case, in the case in which the jury is uncertain. *See County Court of Ulster County v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 2224–30, 60 L.Ed.2d 777 (1979), a criminal presumption case discussing the significant effect that burden-shifting presumptions may have on the outcome of a close case and requiring a close causal connection between the proved fact and the presumed fact. In libel and slander cases generally, there is no particular causal connection between the proved fact (the making of a derogatory statement) and the presumed fact (the falsity of the statement). There is no particular reason to presume falsity.

The Supreme Court has said that before the status quo is changed judicially in libel cases by an award of money damages against the publisher, the First Amendment requires that the plaintiff prove fault. Falsity is an element of fault under the First Amendment that should be proved and not presumed. The District Court therefore erred in placing the burden on the defendant. As a matter of federal First Amendment law, the burden must be placed on the plaintiff to show falsity.

*Id.* at 375–76 (footnote omitted).

–B–

Having decided that it was appellee's burden as plaintiff to prove the falsity of the article published in the *Inquirer*, we must decide whether appellee sustained his burden.

■ The statements in question were: "We called the 17th District police station and asked who was driving car 17B that day and was [sic] told it was occupied by Sgt. Samuel Dunlap"; and, "Asked if he was driving car 17B that day, he [appellee] said, 'more than likely.'" Appellee acknowledges that in one sense it may be said, as appellant argues, that the statements "reported only the undisputed and true facts." However, appellee urges, taken as a whole the article, headline, and photographs gave rise to a false inference. Thus the issue is whether a finding of falsity may be based on a false inference drawn from true facts. We believe it may be.[9]

Taken in context, the statement implied that appellee was in car 17B on the day in question. This implication was false; the evidence is that when the photograph was taken, another officer was in car 17B. N.T. 6/8/79, 361. It seems to us that "true facts" that in context imply a falsehood are, in an action for defamation, not "true."[10] As one commentator has said:

A publisher is, of course, liable for the *implications* of what he has said or written, not merely the specific, literal statements made. To say, for example, that a man and a woman married, but not to each other, spent a night together in a hotel room, will be interpreted as an assertion that the pair engaged in sexual activities, because the average reader will assume that "they saith not a *pater noster* there."

\*     \*     \*     \*     \*     \*

The literal "truth" of a publication need not be established, only that the statement is "substantially true."

**9.** The lower court, too, found the article was false, and said: "The key issue is the necessary implication of the language, no matter how it was couched." Slip op. at 16.

**10.** Appellee does not argue, and did not prove, that it was false for the article to say that police corruption existed, and to imply that whoever was in car 17B was involved in police corruption. Rather, his argument is only that he himself was not in car 17B at the time the photograph was taken, and that therefore the implication that he was false. Appellee's Brief at 4, 6, 12, 13, 16.

The proof of "truth" must go to the "gist" or "sting" of the defamation. The test is "whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.

Sack, *Libel, Slander, and Related Problems*, 50–51, 137–138 (1980) (footnotes omitted) (emphasis in original).

No Pennsylvania case has addressed this issue. Some cases say that an "innuendo" may be the basis of defamatory meaning. *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677 (1962) (innuendo must be warranted, justified and supported by the publication); *Sarkees v. Warner-West Corp.*, 349 Pa. 365, 369, 37 A.2d 544, 546 (1944) (innuendo may not "put an unfair and forced construction on the interpretation of the publication"); *Naulty v. Bulletin Co.*, 206 Pa. 128, 55 A. 862 (1903) (purpose of innuendo is to define defamatory meaning). But as used in these cases, "innuendo" refers to the early common law method of pleading defamatory meaning and not to the "implication" of the communication. As explained by Judge Adams, writing for the Third Circuit:

The term "innuendo" has two possible meanings in the law of defamation, one of which is technical and the other of which is not. The narrow, technical meaning of the term is associated with the common law system of pleading, under which an "innuendo" was an explanation of the defamatory meaning of a communication in light of extrinsic circumstances, the existence of which was averred to in a prefatory statement called an "inducement." *See Restatement, Second, Torts*, § 563, comment (f) (1977). That is *not* the meaning of the word as employed in this opinion. The second, and here the relevant, meaning of "innuendo" is that which it has in common language, namely, the insinuation or implication which arises from the literal language used in a statement or set of comments.

*Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 499 n. 7 (3d Cir.) (statements and "innuendoes" in broadcast not capable of defamatory meaning under

Pennsylvania law), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).

In the absence of any Pennsylvania case, we are free to adopt, and have concluded that we should adopt, the approach of sister states, and hold that the literal accuracy of separate statements will not render a communication "true" where, as here, the implication of the communication as a whole was false. *See* Sack, *supra* at 50–51, 139–40 (collecting cases). As one court has said, "It is not sufficient to take every sentence separately and demonstrate its individual accuracy, detached and wrenched out of context." *Clark v. Pearson*, 248 F.Supp. 188, 191 (D.D.C.1965).

–III–

■ The remaining issue is whether, although defamatory and false, the implication that appellee was in car 17B was published with actual malice or reckless disregard for the truth, as required by *New York Times Co. v. Sullivan, supra*, and its progeny.

The term "actual malice" is not easy to understand or apply. Prosser, Law of Torts § 118 (1971) ("It is certainly highly unfortunate that the Court chose to cling to the discredited term 'malice', which has meant all things to all men, and is here highly misleading."). In attempting to explain what is meant by "actual malice," the Court has said that it is "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This court has emphasized how "extreme" must be the departure by saying:

A showing of no more than negligence, carelessness, bad judgment or inaccuracy in the preparation and publication of an allegedly defamatory article is constitutionally insufficient to show malice.

*Brophy v. Philadelphia Newspapers Inc., supra* 281 Pa.Super. at 602, 422 A.2d at 633.

Here, we are unable to find that appellant acted with the requisite malice, for the record shows that the reporters did everything within their power to ascertain the identity of the police officer in car 17B: there was *no* departure from the standards of "responsible publishers." As discussed above, *see* pages 9–10 *supra*, the reporters made two attempts to verify the information, including interviewing the subject of the story, but they were prevented from doing so by the police department and were therefore forced to rely on appellee's assurance that he was "more than likely" in the car. They had no access to the police records or logs—the police did. It is not apparent what more the reporters could have done to ascertain the identity of the officer in car 17B, especially considering that their surveillance had been discovered and further observation was therefore impossible. N.T. 6/8/79, 333.

The reporters' reliance on appellee's statement that he was "more than likely" in the car did not constitute reckless disregard of the truth, even though the statement had not been double-checked. One of the issues in *Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 439 A.2d 652 (1981), concerned remarks attributable to a "reliable source" who had suggested that the plaintiff, a former United States Attorney, would have been asked to resign if had had not done so. The reliable source was an assistant to the Assistant Attorney General who "was familiar not only with general office procedure but also with the inner workings of the [Criminal] Division" and "had displayed his familiarity" in conversations with the story's reporter. *Id.*, 497 Pa. at 179, 439 A.2d at 660. The Supreme Court held that:

The actual malice standard of *Times v. Sullivan* permits no recovery for the publication of information, obtained from a reliable source, which directly relates to a public official's conduct in office. Indeed, publication of such information in justified reliance on a source is wholly the antithesis of publication with knowledge that the information is false. Nor can it be said that publication in justified reliance on a source displays reckless disregard of whether such information is true or false.

*Id.,* 497 Pa. at 179, 439 A.2d at 660.

If it does not constitute reckless disregard of the truth to rely on information obtained from a source a reporter could expect would be familiar with the subject, then *a fortiori* it does not constitute reckless disregard to rely on information obtained from the subject himself, namely, appellee.

The order of the lower court is reversed and judgment n. o. v. is entered.

BECK, J., files a concurring opinion.

BECK, Judge, concurring:

I endorse the majority's well-reasoned view that as the public official-libel plaintiff,[1] Sergeant Dunlap had the burden of establishing the falsity of the defamatory material.

I depart from the majority's view, however, and would hold that in matters dealing with public officials a finding of falsity may not be based on false inferences drawn from true facts.  While I find the majority's holding correct in matters where public officials are not involved, I conclude that a different standard should be established where public officials are involved.

In the instant case, I would not permit a finding of falsity where a recipient could draw false inferences from statements which the plaintiff admitted were true.

The majority's holding too broadly restricts the press' freedom to publish comment and criticism on official con-

1. In *Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super.Ct. 588, 422 A.2d 625 (1980), *allocatur refused,* February 3, 1981, the trial court held that a police commissioner and two police officers were public officials to whom the *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), standard applied.  On appeal to the Superior Court neither the police commissioner nor the police officers contested their designation as public officials.  Similarly, in the instant case the trial court held that Sergeant Dunlap was a public official whose case was controlled by the "Times malice" test.  As in *Brophy,* on appeal to the Superior Court the public official designation of Sergeant Dunlap was not contested.  Therefore, for the purposes of this litigation we assume, without deciding, the appellee's public official status.  *See Rosenblatt v. Baer,* 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–676, 15 L.Ed.2d 597 (1966).

duct. Too stringent constraints may deter critics of official conduct "from voicing their criticism, even though it is believed to be true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They [would] tend to make only statements which 'steer far wider of the unlawful zone ....'" *New York Times Co. v. Sullivan,* 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964) (citation omitted).

In litigation involving official conduct, the court must weigh the potential mischief that critics of public officials may make against giving the press wider latitude in reporting and criticizing public officials and public policies.[2] To be informed on matters of public interest, a democratic people must have constant recourse to a vigilant and vigorous press.

Therefore, I would hold that Dunlap failed to adduce evidence proving the falsity of the defamatory material. Accordingly, I would enter judgment for the appellant and would abstain from further inquiry in this matter.

Nevertheless, since the majority's reasoning has elicited a discussion of the "Times malice" standard, I offer a brief comment which may further clarify that principle. The "Times malice" criterion as interpreted in this Commonwealth requires that

> public officials ... prove, with 'convincing clarity,' that the defamatory statements relating to their official conduct were made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan,* 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] ... (1964) ....
> What constitutes a reckless disregard of the falsity of a statement was clarified in *St. Amant v. Thompson,* 390

**2.** "The press is the necessary representative of the public's interest in this context and the instrumentality which effects the public's rights." *Saxbe v. Washington Post Co.,* 417 U.S. 843, 864, 94 S.Ct. 2811, 2822, 41 L.Ed.2d 514 (1974) (Powell, J., dissenting) (quoted approvingly in *Herbert v. Lando,* 441 U.S. 153, 189, 99 S.Ct. 1635, 1655, 60 L.Ed.2d 115 (1979) (Brennan, J., dissenting in part)).

U.S. 727, 731 [88 S.Ct. 1323, 1325, 20 L.Ed.2d 262] . . . (1968):

> [C]ases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant, in fact, entertained *serious doubt* as to the truth of the publication. Publishing with such doubts shows reckless disregard to truth or falsity and demonstrates actual malice.

*Brophy v. Philadelphia Newspapers, Inc.*, 281 Pa.Super.Ct. 588, 595–96, 422 A.2d 625, 629–30 (1980) (emphasis added), *allocatur refused*, February 3, 1981.

It is important to note that in the Commonwealth of Pennsylvania to meet the Times malice test publication must be made with reckless disregard or with serious doubt.

The majority does not frame its well reasoned opinion in the context of serious doubt although the lower court opinion addresses the issue of serious doubt. It is therefore important to underscore that some doubt is not serious doubt and that a lack of absolute certainty is not tantamount, without more, to serious doubt. "*Garrison v. Louisiana*, 379 U.S. 64, [74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125] . . . (1964) . . . emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Some doubt on the part of the publisher cannot support the requisite finding of "Times malice."[3] "The rationale for [the] strict ["Times malice"] standard is the recognition that 'erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive . . . ."'" *Brophy*, 281 Pa.Superior Ct. at 602, 422 A.2d at 633 (quoting *New York Times Co.* at 271–72, 84 S.Ct. at 721) (citation omitted).

**3.** *St. Amant* at 731, 88 S.Ct. at 1325.

The trial court permitted a finding of serious doubt ("Times malice") where the appellant published with some doubt or without absolute independent substantiation of every published statement. As stated in *New York Times Co.* at 279, 84 S.Ct. at 725, "[a] rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship ....' The rule thus dampens the vigor and limits the variety of public debate [and] is inconsistent with the First and Fourteenth Amendments." (Footnote omitted.)