**Amrit LAL**

v.

**CBS, INC.**

**Civ. A. No. 81–1100.**

United States District Court, E.D. Pennsylvania.

Nov. 17, 1982.

**358**

Eugene A. Steger, Jr., Kennett Square, Pa., for plaintiff.

George P. Williams, III, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, Chief Judge.

Plaintiff, Amrit Lal, brought this diversity action seeking damages for defamation (Count I) and trespass (Count II) arising out of the production and publication of a news report aired by defendant, CBS, Inc. (CBS), through WCAU–TV, a station operated by CBS in Philadelphia. CBS has

moved for summary judgment. Fed.R. Civ.P. 56. For reasons hereafter stated, I conclude that CBS is entitled to summary judgment only as to the trespass count of the complaint. With respect to the defamation count, material issues of fact remain and, therefore, summary judgment is inappropriate.

Summary judgment should not be granted unless the moving party establishes that there is no material issue of fact and that he is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), *Hollinger v. Wagner Mining Equipment Co.,* 667 F.2d 402, 405 (3d Cir.1981). Further, all inferences from the undisputed facts must be drawn in favor of the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

From the record as presented on this motion, the following facts are not in dispute. Amrit Lal, a professor of political science at Cheyney State College, owns various properties in West Chester, Pennsylvania, including a dwelling house located at 217 East Nield Street. In March 1980, Lal leased the East Nield Street house to five students of West Chester State College. On or about March 9, 1980, Lal learned that Ellen Sands, editor of the *Quad,* the student newspaper at West Chester State College, was preparing an article concerning conditions at properties plaintiff owned in West Chester. On March 17, 1980, after Sands refused Lal's request to review the proposed article, Lal filed suit in the Court of Common Pleas for Chester County against Sands, West Chester State College and several others to redress alleged violations of his civil rights. In addition to seeking legal and equitable relief, plaintiff also sought to preliminarily enjoin the publication of the article until he had an opportunity to review and respond to it. A hearing on plaintiff's petition for a preliminary injunction was scheduled for March 21, 1980.

On March 18, 1980, an edition of the *Quad* was published containing an article entitled, "Landlord-tenant conflict." The article de-

scribed relations between Lal and the tenants at 217 East Nield Street. Accompanied by photographs, the article also recited several serious problems existing at the premises and stated that Lal had been cited for various violations of the housing code which he had failed to correct. In addition, the article disclosed that Lal had threatened to evict the tenants if they did not retract their statements to the *Quad.*

A hearing on Lal's petition for a preliminary injunction was held as scheduled on March 21, 1980. From the transcript of that hearing, which is part of the record on this motion, it appears that the hearing lasted only a few minutes. Lal addressed the court initially and asked to withdraw his petition as moot because the *Quad* article had been published three days earlier. Counsel for West Chester State College then directed the court's attention to the March 18 edition of the *Quad* and also requested the court to dismiss the petition.[1] Lal's request to withdraw his petition was then granted, and the hearing was adjourned. This court has been apprised by Lal's counsel that the suit in the Court of Common Pleas for Chester County is still pending.

Roseanne Cerra, a news reporter for WCAU–TV, had been assigned to attend the preliminary injunction hearing and to report on the proceedings. Accordingly, she and two WCAU–TV technicians were present at the hearing and, at its conclusion, conducted videotaped interviews of Lal, Sands, and the president of West Chester State College. In compiling her story, Cerra also visited 217 East Nield Street and, after asking tenant Amy Wertz for permission to inspect and film the interior of the house, Cerra and her crew filmed various conditions in the premises at the time. None of these conditions were created or aggravated by Cerra or the technicians. Finally, to complete her story, Cerra and the two technicians visited and filmed individuals at work in the offices of the *Quad* at West Chester State College.

That evening, CBS aired Cerra's report during the 5:30 p.m. edition of WCAU–TV's News Telecast. The report began with anchorwoman Sherry Bank stating that a "case centered on an article about bad conditions at some off-campus student housing" had ended in "triumph" for students at West Chester State College. Roseanne Cerra then stated:

Reporters at West Chester State College's student newspaper, the Quad, were busy working on today's edition without the aid of their editor-in-chief, Ellen Sands. Sands was at a hearing at the Chester County Court House this morning ready to defend her rights as a journalist. Sands had written an article in the student paper accusing a West Chester landlord of not making necessary repairs to an off-campus house where five students lived. The tenants said their many complaints of leaky roofs, faulty wiring and other eyesores were never answered. They also said their landlord threatened to vacate any tenant who spoke to the press. The landlord, Amrit Lal, a political science professor at Cheyney State College, accused Sands of printing lies to generate racial tensions within the community. Lal, a native of India, also claimed his civil rights were violated.

The video portion of the report which was shown simultaneously with Cerra's reference to "leaky roofs, faulty wiring and other eyesores" contained views of the interior of the three-story dwelling house at 217 East Nield Street. Specifically, a waterstained first-floor ceiling was shown as the viewer heard the words "leaky roofs"; an unshaded and imperfectly attached ceiling light fixture was shown as mention was made of "faulty wiring"; and exposed insulation on the back porch of the house was shown as Cerra spoke the words "other eyesores".

After Cerra completed her summary of the *Quad* article, portions of the three interviews taped earlier were shown. Cerra then summarized what transpired at the

[1] It is unclear from the record whether the March 18 edition of the *Quad* was formally introduced into evidence at the preliminary injunction hearing.

preliminary injunction hearing and closed by quoting Sands' statement that "she would continue to write articles on landlords—landlords of every race, color and creed."

The production and broadcast of the WCAU–TV news report form the foundation of plaintiff's suit in this court. In Count I of the complaint, the defamation count, Lal alleges that the broadcast was false, known by CBS to be false, and that CBS' motive in publishing the news report was "to sensationalize, exaggerate and totally imply a false misleading impression of plaintiff's character, person and community status." (Complaint ¶ 9). In Count II, Lal alleges that Cerra and her crew trespassed on his property by entering 217 East Nield Street without his permission. CBS seeks summary judgment on each of these counts.

The threshold issue raised on CBS' motion for summary judgment on the defamation claim is whether the news report is capable of a defamatory meaning. Under Pennsylvania law, which applies to this diversity action,[2] "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971) (quoting *Restatement of Torts* § 559 (1938)). Further, "it is the function of the court, in the first instance, to determine whether the communication complained of is capable of a defamatory meaning." *Id.* Applying these principles, CBS contends that the report is not capable of a defamatory meaning.

> Viewed in its entirety, the news story simply reported the results of a court hearing on a lawsuit *initiated by Lal* to enjoin the publication of the Quad article. The broadcast described the portions of the article which Lal found objectionable and communicated his accusation that the article was printed to generate racial tensions in the community.

(Memorandum of Defendant in Support of its Motion for Summary Judgment at 10–11) (Emphasis in original). Lal's interpretation of the broadcast is altogether different. In his eyes, the purpose and effect of the broadcast was to portray him as a slumlord.

█ I have no difficulty in finding that the news report is capable of a defamatory meaning. Lal owns several properties in West Chester from which he derives rental income. If the broadcast may be interpreted as portraying Lal as a slumlord who preys upon the economically disadvantaged, it certainly might deter persons from associating or dealing with him. It is hardly inconceivable that viewers might have so interpreted the broadcast. The juxtaposing of the video of the interior of 217 East Nield Street with Cerra's statement that plaintiff ignored the tenants' "many complaints of leaky roofs, faulty wiring and other eyesores" obviously could have left viewers with the impression that plaintiff is an unscrupulous landlord. I recognize that CBS' suggested interpretation—that the broadcast, viewed in its entirety, is simply a report on a legal controversy involving Lal—may have been the meaning in fact understood by the viewers. Nevertheless, the report is at least capable of a less innocent interpretation. It is for the jury, not for me, to determine ultimately whether defamatory meaning was in fact conveyed to the viewers of the broadcast.

CBS also seeks summary judgment on the ground that the broadcast was substantially true and accurate. Lal argues in response that the broadcast was not truthful; that it was false and misleading in three important respects. First, Lal disagrees with the characterization of the case ending in "triumph" when in fact his suit against Sands and West Chester State College is still pending before the Court of Common Pleas for Chester County. Second, Lal maintains that the reference to his Indian ancestry was designed to foster ill-will toward him

---

**2.** Judging from their legal memoranda, the parties assume that Pennsylvania law applies. Since the alleged defamation was published in Pennsylvania and because *its* target is a Pennsylvania citizen, I see no reason for disturbing the parties' choice of law.

by an audience which was already antagonistic toward Asians because of the then current Iranian hostage crisis. Third, plaintiff contends that it was untruthful to report that the 217 East Nield Street house had a leaky roof and contained faulty wiring. I shall examine each of these alleged falsehoods in turn.

■ The news report began with anchorwoman Sherry Bank stating: "A freedom of press case is ending in triumph for some college students in West Chester who face their first challenge as journalists." Lal argues that this statement is false because the withdrawal of his petition for a preliminary injunction did not constitute an end to his lawsuit. Since his suit for damages is still pending, Lal asserts that no triumph has resulted in the case to anyone. The error in this argument lies in plaintiff's failure to consider Bank's statement in context with the remainder of the news report. Roseanne Cerra explained that the court hearing was held on Lal's petition to preliminarily enjoin the publication of the *Quad* article and that he had withdrawn his petition for preliminary relief since the article in question had already been published. Hence, there is no mistaking what Ms. Bank meant by the case ending in "triumph," i.e., that the article was published. While Lal may disagree with Bank's choice of words, her statement taken in context was neither false nor misleading.

■ Similarly, I find nothing false or misleading about Cerra's reference to Lal's Indian ancestry. Lal does not deny his heritage. Rather he asserts that mention was made of it solely to capitalize on the nation's attention to events happening in Iran and on the alleged mounting hatred in this country toward Asians in general. Even accepting this assertion, it was Lal, not CBS, who interjected his ancestry into the judicial proceedings. In his petition for preliminary injunction, Lal alleged that he was of "Asian-Indian descent" and that the proposed *Quad* article was racially motivated. Cerra merely repeated the substance of plaintiff's allegations.

The final dispute on the question of truth concerns the alleged state of disrepair of the East Nield Street house. Lal contends, and his affidavit so avers, that the house had neither a leaky roof nor faulty wiring on the date of the broadcast. CBS replies that Cerra's report never stated that the house was in disrepair. Rather, her comment on "leaky roofs, faulty wiring and other eyesores" was made in reference to the tenants' complaints and was fully attributed to the *Quad* article. Since Lal cannot deny that Cerra's summary of the article was accurate in all respects, CBS argues that there is no triable issue of fact.

■ CBS' argument is misplaced. On the issue of truth alone, it is irrelevant that Cerra's summary of the *Quad* article is fair and accurate. Under Pennsylvania law, CBS cannot escape liability merely by attributing the alleged defamation to a third party for "one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." *Restatement (Second) of Torts* § 578; *see Medico v. Time, Inc.,* 643 F.2d 134, 137 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). Thus the truth of the underlying alleged defamation must be shown in order to establish the defense of truth.[3] Since a question of fact is presented on this issue, it is not an appropriate ground for summary judgment.

■ There is one important exception to the traditional rule that the republisher is just as liable as the publisher of the

---

**3.** During oral argument, counsel for CBS directed the court's attention to the Pennsylvania Superior Court's recent decision in *Dunlap v. Philadelphia Newspapers, Inc.,* 448 A.2d 6 (1982), wherein it was held that the burden of proving the truth of a publication may not constitutionally be placed upon a defendant in a defamation action. Hence, CBS argues under *Dunlap* that it is plaintiff's burden to prove that the broadcast was false. Although I predict that the Pennsylvania Supreme Court would reverse its prior decisions and follow *Dunlap* were it presented with the issue, I need not decide the point at this time. Irrespective of the placement of the burden of proof on the truth defense, an issue of fact would still remain as to whether the broadcast was true or false.

original defamation. The Pennsylvania courts follow the approach taken by the *Restatement (Second) of Torts* § 611 (1977)[4] and recognize a "fair report" privilege for the media to comment on official proceedings. *See Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 324, 275 A.2d 53 (1971) (citing first *Restatement*). The nature and origin of this privilege was recently discussed in *Medico v. Time, Inc., supra:*

> The fair report privilege . . . developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer. Pennsylvania had adopted the republication rule by the turn of the century, and no case brought to our attention suggests that Pennsylvania has abandoned it . . . .
>
> To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and the truth defense, the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings, the law abandons the assumption that the reporter adopts the defamatory remarks as his own. The privilege thus permits a newspaper or other press defendant to relieve itself of liability without establishing the truth of the substance of the statement reported.

643 F.2d at 137–38. The fair report privilege is not absolute, however; the privilege may be lost if the defamatory material is published solely to cause harm to the person defamed and also if the publisher overly embellishes the account of the official proceeding. *Binder v. Triangle Publications, Inc., supra; Sciandra v. Lynett*, 409 Pa. 595, 600, 187 A.2d 586 (1963).

■ CBS seeks to place itself within the privilege by arguing that the news report fairly and accurately summarized the proceedings held on Lal's petition for preliminary injunction. Lal, on the other hand, argues that CBS exceeded the scope of the privilege by including within the news report matter that was extraneous to the judicial proceedings. According to Lal, neither the contents of the *Quad* article nor the video of the house were part of the judicial proceedings. Alleging that this latter material was added to sensationalize the report, Lal argues that CBS abused its privilege of fair comment.

I note initially that there is no doubt in my mind that Cerra's summary of the *Quad* article was fair and accurate. Likewise, the remainder of the audio portion of the broadcast was also a fair and accurate summary of the proceedings in state court. An issue is presented, however, as to whether the *Quad* article was part of the judicial proceedings reported by CBS. Lal's position is that the article could not have been part of the proceedings because it was not in existence at the time he filed suit and because the article was not formally admitted into evidence during the preliminary injunction hearing. I reject this argument and conclude that CBS' summary of the article is protected by the fair report privilege. It is of no consequence that the article was not formally admitted into evidence at the hearing. From the transcript of that hearing, it is plain that the edition of the *Quad* containing the article was referred to by counsel for all parties. Moreover, it appears that counsel for West Chester State College handed an edition of the newspaper up to the court, and although he did not go into the substance of the article, the article was before the court. More importantly, Lal is mistaken in defining the judicial proceedings reported by CBS as encompassing only the preliminary injunction hearing. The news report did focus on the hearing itself, but reporting on the hearing required also a report on the underlying controversy. Lal's complaint in state court sought dam-

---

4. Section 611 provides:

§ 611 Report of Official Proceeding or Public Meeting. The publication of a defamatory matter concerning another in a report of an official action or proceeding . . . that deals with a matter of public concern is privileged if the report is accurate and complete or fair abridgement of the occurrence reported.

ages as well as equitable relief. His suit for damages—based, *inter alia,* upon the publication of the *Quad* article—was pending on the date of the broadcast and is pending today in the Court of Common Pleas. He cannot persuasively argue, therefore, that the *Quad* article was not involved in the judicial proceedings reported by CBS.

The video portion of the broadcast containing views of the interior of the house presents a different question. Lal contends that CBS used these shots not to report on the judicial proceedings, but instead to suggest that the statements in the *Quad* article were in fact true. In my view, Lal has at least raised an issue of fact as to whether CBS abused its qualified privilege of fair report by including the video of the house in the broadcast. The video obviously was not obtained from the judicial proceedings, and the parts of the house shown in the televised report were not identical to those depicted in the *Quad* photographs. Hence, CBS cannot successfully maintain that the video of the house was part of the judicial proceedings. On the other hand, I cannot conclude as a matter of law that CBS abused the privilege. It is undisputed that the conditions filmed at the house were not altered or aggravated by Cerra or her crew. Presumably, therefore, the video of the house speaks for itself. The issue for the jury is whether the juxtaposition of that video with Cerra's oral summary of the judicial proceedings destroys the objectivity of the broadcast. If so, the privilege would be lost, and an issue of fact would arise as to whether the statements in the *Quad* article were true or false.

Finally, CBS argues that Lal is a public figure and, therefore, must prove actual malice in order to prevail on his defamation claim. Asserting that Lal cannot prove actual malice, CBS moves for summary judgment. The foundation of CBS' public figure argument is that "plaintiff has so thrust himself into the purview of the public that he should be characterized as a public figure for purposes of reports bearing on his activities as a landlord in the West Chester area." (Memorandum of Defendant in Support of Its Motion for Summary Judgment at 23). To substantiate this, CBS points to two newspaper articles concerning Lal and his properties, citations for housing code violations issued to Lal between 1973 and 1978, and evidence that Lal has instituted legal proceedings in the past to silence public comment on his properties. Plaintiff's opposing argument is that one who initiates legal action to protect his own *private* interests cannot be treated as having thrust himself into any public controversy.

Although there appears to be merit in Lal's position, *see Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979); *Time, Inc. v. Firestone,* 424 U.S. 448, 453–55, 96 S.Ct. 958, 964–65, 47 L.Ed.2d 154 (1976), I need not decide the constitutional question on the limited record presented on this motion. Assuming, for purposes of this motion only, that plaintiff is a public figure, he cannot prevail unless he establishes that (1) "at least some of the material contained in the broadcast was false" *and* (2) that CBS published the material knowing of its falsity or with reckless disregard for the truth. *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 274–75 (3d Cir.1980). Lal's affidavit suffices to create a question of fact as to the truth of the matters contained in the broadcast. As to the second element, CBS admits that Cerra visited and inspected the dwelling house at 217 East Nield Street. Thus, if the averments in Lal's affidavit are true—and I must accept them as being so, the inference arises that Cerra knew that some of the statements contained in the broadcast were in fact false or that she was reckless in failing to perceive the falsity of those statements.

In sum, because material issues of fact remain to be tried as to Lal's cause of action for defamation, CBS' motion for summary judgment on Count I of the complaint will be denied.

With respect to Count II of the complaint, the trespass count, there are no disputed material issues of fact. Accord-

ingly, the matter is ripe for summary judgment. The basis of the trespass cause of action is the alleged unauthorized entry by Cerra and two other WCAU–TV employees onto Lal's property at 217 East Nield Street. CBS does not dispute that Lal's permission to enter the property was never obtained. Instead, CBS has submitted the affidavit of Amy Wertz, the tenant in possession, stating that Cerra and her crew entered with Wertz' permission and that they did not aggravate conditions existing on the property. On these facts, I conclude that CBS is entitled to summary judgment on Count II of the complaint. It is elementary that an owner who is not in possession cannot maintain an action for trespass absent an injury to his reversion. Prosser, *Handbook of the Law of Torts*, § 13. Wertz, as tenant, had the right of possession of the premises and Cerra and her crew had the right to rely on Wertz' apparent right to possession. Lal argues that Wertz' consent to Cerra's entrance on the premises was ineffective because he had given her instructions not to permit members of the media on the property. Even if such restriction on Wertz' right of possession had been included in her lease (and there is no suggestion that it was), it could have no effect on persons without notice of such restrictions. Accordingly, I will grant CBS' motion for summary judgment on the trespass count.