**Earle W. LANNING, Personal Representative for the Estate of Ruth M. Lanning, Deceased**

v.

**H. June WEST, Appellant.**

Superior Court of Pennsylvania.

Submitted April 17, 2002.
Filed July 9, 2002.

Richard W. Knecht, Berwick, for appellant.

Thomas E. Leipold, Bloomsburg, for appellee.

Before JOYCE, BECK and POPOVICH, JJ.

POPOVICH, J.

¶ 1 This is an appeal from the judgment entered May 9, 2001, in the Court of Common Pleas of Montour County, that followed the denial of H. June West's motion for judgment notwithstanding the verdict on February 21, 2001.[1] Upon review, we affirm.

¶ 2 Appellant H. June West raises three issues for our review:

A. Whether the verdict entered in favor of the Plaintiff is supported by sufficient evidence;

B. Whether the [lower] Court erred as a matter of law with respect to the

---

1. We feel it is important to note that the order of the lower court denying Appellant's motion for post-trial relief was *dated* February 16, 2001, but *entered of record* on February 21, 2001. West took appeal from that order on March 20, 2001. However, Lanning failed to praecipe to enter judgment in this case. Judgment was entered following West's praecipe on May 9, 2001. Pa.R.A.P. 905(a) states, in relevant part, that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Therefore, although West filed her notice of appeal prior to the entry of judgment, the appeal is deemed timely filed pursuant to Pa.R.A.P. 905(a).

burden of proof applied in the determination of the existence of a gift; and

C. Whether the judgment entered in favor of the Plaintiff was against the weight of the evidence.

Appellant's Brief, at 3.

■■■ ¶ 3 In *Goldberg v. Isdaner*, 780 A.2d 654, 659–660 (Pa.Super.2001), we enunciated our standard of review with respect to an appeal from the denial of a motion for judgment N.O.V.:

In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must "consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner." *Walker v. Grand Central Sanitation, Inc.*, 430 Pa.Super. 236, 634 A.2d 237, 240 (Pa.Super.1993). "Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical." *Brown v. Philadelphia College of Osteopathic Medicine*, 2000 PA Super 262, 760 A.2d 863, 868 (Pa.Super.2000). We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. *Mitchell v. Moore*, 1999 PA Super 77, 729 A.2d 1200, 1203 (Pa.Super.1999). Further, "the standard of review for an appellate court is the same as that for a trial court." *Ferry v. Fisher*, 709 A.2d 399, 402 (Pa.Super.1998). There are two bases upon which a judgment N.O.V. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court

reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Campo v. St. Luke's Hospital*, 2000 PA Super 155, 755 A.2d 20, 23 (Pa.Super.2000) (citations omitted).

*Goldberg*, 780 A.2d at 659–660.

¶ 4 The relevant facts, viewed in a light most favorable to Lanning as the verdict winner, are as follows: Ruth Lanning (Decedent), a former resident of Danville, Pennsylvania, was the mother of Earle W. Lanning (Lanning) and H. June West (West). After the death of her husband in 1994, Decedent placed her liquid assets into joint accounts bearing her name and West's name on June 5, 1996. West closed a $19,294.14 joint savings account with Mellon Bank and placed the funds in Mellon Bank CD # 0067812, which she held jointly with Decedent. On July 1, 1996, West closed Mellon Bank CD # 0067812, and placed the total funds ($21,829.34) in Mellon Bank CD # 00343530, also which she held jointly with Decedent. That same date, West cashed out Mellon Bank CD # A09144–C and placed the total funds ($48,004.92) into Mellon Bank CD # 00343530. All monies in the joint accounts were contributed solely by Decedent. After suffering a seizure, Decedent moved from Danville to the state of New York on or about December 15, 1996, and resided with West. During Decedent's stay with West, West provided care for Decedent by preparing her meals and aiding her various medical problems.

¶ 5 While Decedent resided with West, West closed several joint accounts with right of survivorship held with Decedent,

opened new joint accounts and retained some of the funds. Specifically, West closed a joint checking account with Mellon Bank on December 18, 1996, and retained the balance of $1,146.77. Thereafter, on January 3, 1997, West closed the other Mellon Bank Savings account and retained the balance ($656.63). West cashed out Mellon Bank CD # 00329765 on January 15, 1997, obtaining the balance ($43,981.76). West retained $11,081.76 from Mellon Bank CD # 00329765 and placed the remaining funds ($32,900.00) in First National Bank of Rochester CD # 10001 on February 21, 1997. In the midst of these transfers, Decedent executed a durable power of attorney in favor of West on March 2, 1997. Afterwards, on March 24, 1997, West closed First National of Rochester Bank CD # 10001, and placed the total funds ($33,004.78) in First National Bank of Rochester CD # 10002. Later, on April 18, 1997, West cashed out Mellon Bank CD # 00343530, which was worth $80,156.62 when it was cashed, but West had to pay a $2,342.41 penalty for early withdrawal. With the remaining funds ($77,814.11), West opened a $70,814.11 annuity with Met Life, naming Decedent as annuitant and West as owner. West retained the remaining balance of $7,000.00.

¶ 6 Decedent returned to Danville, Pennsylvania, on or about June 10, 1997, to stay with Lanning for two weeks to allow West to visit relatives and rest. At trial, Lanning testified that when Decedent arrived in Danville, she was in good physical health but was upset at the prospect of returning to New York state, and she indicated that she wanted to stay in Danville. After staying in Lanning's home for several days, Decedent returned to her trailer in Danville, Pennsylvania. Decedent lived alone in her trailer, but Lanning and his wife assisted in caring for her daily needs.

¶ 7 Shortly after Decedent's return to Pennsylvania, she became aware that something was wrong with her finances. At about the same time, Lanning suggested that Decedent execute a durable power of attorney in Lanning's favor, so that he would be able to assist Decedent in paying her bills. Lanning assisted Decedent in contacting the Columbia–Montour Area Agency on Aging, who referred Decedent to Attorney Susan T. James of the law firm of James, Mihalik, Buehner and Leipold to execute a new durable power of attorney in favor of Lanning. On July 3, 1997, Decedent retained Attorney Susan T. James to prepare a new durable power of attorney for Decedent naming Lanning as her Attorney–In–Fact and to prepare a revocation of her prior durable power of attorney in favor of West. Decedent wished to revoke her prior durable power of attorney in favor of West because she was concerned about West's handling of the monies she placed in joint accounts. Attorney Susan T. James questioned Decedent regarding what she thought her net worth was at the time of the meeting, and Decedent stated that she thought her net worth was approximately $100,000.00. After consultation with the First National Bank of Rochester, Attorney Susan T. James informed Decedent that she had only approximately $20,000.00 remaining in the bank where her last known accounts were held.[2] Decedent was shocked, extremely upset and cried upon hearing of the state of her finances, but nevertheless was competent to revoke her prior durable power of attorney and to execute a new

---

**2.** The funds were located in the First National Bank of Rochester in a checking account and the remainder of First National Bank of Rochester CD # 10002. The balance in the checking account was $1,359.74, and the balance remaining in that CD was $20,435.06, after withdrawals made by West that totaled $12,769.00.

durable power of attorney in favor of Lanning. Attorney Susan T. James also facilitated a release of the remaining funds from the accounts in the First National Bank of Rochester, which were later deposited into an account held jointly by Decedent and Lanning.

¶ 8 Attorney Susan T. James wrote to West on August 4, 1997, demanding an accounting and a return of the assets that West appropriated. West retained Attorney Christopher C. Pratt in New York state to respond to Attorney Susan T. James' letter. Attorney Pratt corresponded with Attorney Susan T. James, informing her of the annuity held in Decedent's benefit, but did not offer a voluntary accounting of the assets she appropriated, nor did Attorney Pratt indicate that West would return any of Decedent's other property.

¶ 9 Lanning, as personal representative of the Decedent, commenced suit against H. June West *via* a Praecipe for a Writ of Summons on January 23, 1998, in order to recover the funds obtained by West. At trial, Attorney Susan James testified that suit was brought in this manner because Decedent did not wish to "hurt" her daughter but still wished to recover the monies to allow her children and grandchildren to benefit equally from her estate. On or about August 19, 1998, Attorney Thomas James, also of the law firm of James, Mihalik, Buehner and Leipold, filed a petition to compel the production of documents relating to the accounting of Decedent's finances. On September 25, 1998, Attorney Pratt sent a letter detailing the accounting of Decedent's finances, which was corroborated by Attorney Susan James' independent investigation of Decedent's finances.

¶ 10 During the pendency of the suit, Decedent suffered a stroke and died on April 7, 1998, before the Complaint was filed. Lanning petitioned the lower court, requesting that he be substituted as plaintiff in the action on December 31, 1998. The lower court granted Lanning's petition to succeed Decedent as plaintiff on January 4, 1999. Lanning, represented by Attorney Thomas James, filed a Complaint alleging that West converted Decedent's funds in the joint accounts (without Decedent's permission) for West's own use and seeking to recover the funds for the benefit of Decedent's Estate. West alleged in her Answer that Decedent placed the money in the joint accounts as an *inter vivos* gift.

¶ 11 A bench trial was held on July 18–19, 2000. The trial court found in favor of Lanning, holding that West did not prove by clear and convincing evidence that Decedent transferred the funds in the joint accounts to West as an *inter vivos* gift. On October 12, 2000, the trial court awarded damages to the Estate of Ruth M. Lanning in the amount of $94,430.27. The trial court found that the transfers amounted to $103,468.27, but credited certain living expenses and damages in the amount of $9,038.00 that were incurred by West during Decedent's stay at West's home. West filed a motion for judgment N.O.V. on October 26, 2000.[3] The trial

---

**3.** We also note that West's motion for Judgment N.O.V. was untimely. Pa.R.Civ.P. 227.1(c)(1) requires that post-trial motions be filed ten days after the verdict. In this case, the verdict was rendered on October 12, 2000, for purposes of Rule 227.1(c), the run date to file post-trial motions would have been October 23, 2000. Nevertheless, Lanning did not object to the untimeliness of the post-trial motion, and the trial court chose to address the untimely post-trial motion. Accordingly, the issues raised within the motion are not waived. *See Mammoccio v. 1818 Market Partnership,* 734 A.2d 23 (Pa.Super.1999) (holding that when a party files post-trial motions at a time when the court has jurisdiction

court denied that motion on February 21, 2001. West brought a timely appeal to this Court on March 20, 2001.

¶ 12 We consider first whether the evidence was sufficient to sustain the trial court's verdict. Initially, we note that West raises her sufficiency of the evidence claim within the context of an appeal from a denial of a motion for judgment N.O.V. Where the evidence is insufficient to sustain the verdict or decision of the trial court, the remedy granted in civil cases is a judgment notwithstanding the verdict. *Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 206 (1991), *appeal denied*, 530 Pa. 644, 607 A.2d 254 (1992). We will thus address West's sufficiency of the evidence claim in the context of her appeal from the denial of her motion for judgment N.O.V. *Boutte v. Seitchik*, 719 A.2d 319, 322 n. 6. (Pa.Super.1998). West contends judgment N.O.V. was proper because Lanning had not provided sufficient evidence for the court to find a conversion

over the matter but outside the ten-day requirement of Pa.R.C.P. 227.1, the trial court's decision to consider the motions should not

of property and because she established by clear, convincing and direct evidence that the funds were placed in joint accounts as *inter vivos* gifts.

¶ 13 In *Pioneer Commer. Funding Corp. v. Am. Fin. Mortg. Corp.*, 2002 PA Super 68, ——, 797 A.2d 269, 279–80 (2002), we defined the tort of conversion as, "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." Money, of course, can also be the subject of conversion. *Id.* at 280. Here, the trial court was presented with sufficient evidence to find that West deprived Decedent of her property rights in the funds she deposited in the joint accounts. This is especially true when we examine the testimony of Attorney Susan T. James. When asked by Plaintiff's counsel why Decedent wished to revoke the durable power of attorney in favor of West, Attorney Susan T. James testified:

be subject to review unless the opposing party objects).

SUSAN T. JAMES: . . . There was some concern about the status of her finances.

MR. LEIPOLD: What was the nature of the concern?

SUSAN T. JAMES: That she was unsure of what was left and she was concerned that she did not have control over it as well. While we were at the meeting I was able to obtain the phone number, and I am not quite sure how I was able to get that, of the gentleman at the bank where the last known account was being held.

MR. LEIPOLD: Let me stop you for a minute. Did [Decedent] indicate to you what she understood her approximate worth or her financial situation to be?

SUSAN T. JAMES: Her understanding, as I recall it, was around $100,000.00, perhaps more. I am not certain of the exact amount, but it was at least $100,000.00, if not more.

MR. LEIPOLD: You made reference to the fact that you obtained this telephone number for a bank where the last known account was maintained. What happened from there?

SUSAN T. JAMES: I called the bank with [Decedent] and Mr. Lanning present, and I spoke with a gentleman there who was able to give me the status of the account that was being presently held there. And I, as a result of our conversation, the information he gave me was there was a balance of $20,000.00, approximately 20,000.00 remaining.

I told [Decedent] that, and at the time as soon as I repeated the amount that was left she burst into tears and was very upset at what she had just heard.

MR. LEIPOLD: Did she indicate any basis for her upset or for her reaction?

SUSAN T. JAMES: Yes, the basis for that she indicated was because she thought she had so much more than that and she didn't know where the rest was.

MR. LEIPOLD: What steps, if any, did you take on [Decedent's] behalf to assume possession of this remaining twenty odd thousand dollars in the account?

SUSAN T. JAMES: We were faxed immediately a release of funds. And, I am not sure what the exact name of that document was from the bank that was executed by [Decedent] on that, at that same meeting, asking for the transfer of funds from the bank. And there were two accounts, I believe, at that time, that the remainder of the C.D., checking account, to have that money transferred as soon as possible to [Decedent].

N.T., 7/18/2000, at 79–81.

¶ 14 Attorney Susan T. James also testified that Decedent never received any of the annuity income from the $70,814.11 annuity in her favor, nor did West return certain items of Decedent's personal property. N.T. 7/18/2000, at 89. The testimony of Attorney Susan T. James, Decedent's emotional reaction upon hearing of the dissolution of her finances, her immediate withdrawal of her remaining funds (to prevent further withdrawals by West) and her

revocation of the durable power of attorney in favor of West were sufficient for the fact-finder to determine that West was without the legal justification and authority to appropriate Decedent's funds in the manner that she did.

¶ 15 West's rebuttal testimony did not in any instance refute or call into question Decedent's displeasure with West as her Attorney–In–Fact nor was her testimony clear and convincing with regard to her defense that the funds placed in the joint accounts were *inter vivos* gifts. Generally, the burden of proving an *inter vivos* gift is placed initially on the putative donee. *See In re Estate of Pappas*, 428 Pa. 540, 542, 239 A.2d 298, 300 (1968). The putative donee must show a *prima facie* case through clear, direct and convincing evidence that an *inter vivos* gift has taken place. *Id.* Once a *prima facie* case is established by the putative donee, a presumption of the validity of the gift arises, then the burden shifts to the contestant to show by clear and convincing evidence that the property in question was not given as an *inter vivos* gift. *Id.* With respect to

joint accounts with right of survivorship, the Pennsylvania Probate, Estates and Fiduciaries Code states:

> [a] joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent.

20 Pa.C.S.A. § 6303(a); *see also Wilhelm v. Wilhelm*, 441 Pa.Super. 230, 657 A.2d 34 (1995).

¶ 16 Here, Decedent was still living while the joint accounts were opened and closed, and, therefore, 20 Pa.C.S.A. § 6303(a) controls. Decedent contributed 100% of the funds to the joint accounts. Therefore, 100% of the joint account belonged to Decedent. In order to use the claim of *inter vivos* gift as a defense, West was required to show that the funds in the joint accounts were *inter vivos* gifts through the analysis set forth in *Pappas*. Defense counsel questioned West as follows:

MR. KNECHT: After the move back to Danville, did you and [Decedent] have any discussions with respect to what she intended to do with her estate, and by that I mean anything she would have, including money?

WEST: Only after my Dad died did she start to discuss stuff like that with me. And she mentioned that she had done a few things and like C.D.'s (sic), and she said she had put them in joint names and that she wanted me to have them. And, at the time I didn't really need them. So, she just kept them as they were.

N.T., 7/19/2000, at 33.

¶ 17 In fact, further review of West's testimony indicates that she was unable to explain the process by which she cashed Mellon Bank C.D. # 00343530 and ob-

tained the annuity with the proceeds and, thus, refute Lanning's claim that she converted the funds to her own use. On cross-examination Lanning's counsel asked West the following:

MR. LEIPOLD: This appears initially to be a letter dated September 25, 1998 from Attorney Pratt to Attorney James, which has attached to it a one-page document with a heading Lanning accounting?

WEST: Um-hum.

MR. LEIPOLD: Which purports to be an accounting of the various accounts maintained between you and your mother?

WEST: Right.

MR. LEIPOLD: Is it fair to say that this document was prepared by the accountant Mr. Butler based upon knowledge and information provided to him by you?

WEST: Of course.

MR. LEIPOLD: If we look at, including the explanation column, the fourth column from the left has the heading June West. Do you see that?

WEST: Yes.

MR. LEIPOLD: And the second numerical entry down in that column shows interest earned $7,000.00 annuity that money paid to June West, is that correct?

WEST: Right.

MR. LEIPOLD: The date of that transaction is shown as 4–18–97, do you see that?

WEST: Okay, yes.

MR. LEIPOLD: And the heading on that says Mellon Bank C.D. to annuity. Do you see that?

WEST: Yes.

MR. LEIPOLD: It is true, isn't it, that when this transaction was done a C.D. with a balance of approximately $80,000.00 at Mellon Bank was cashed in and $70,814.00 was used to purchase the annuity and $7,000.00 was paid to you?

WEST: No, $70,814.00 was the amount of the C.D.

MR. LEIPOLD: Ma'am, is it your testimony that the purchase price of the annuity was not $70,814.11?

WEST: That was the purchase price of the annuity, $70,814.00.

MR. LEIPOLD: And you said that was also the amount of the C.D. that was cashed in?

WEST: Correct.

MR. LEIPOLD: Are you saying that upon cashing in the C.D. for $70,814.11—

WEST: Um-hum.

MR. LEIPOLD: Upon using that amount for the purchase of an annuity—

WEST: Right.

MR. LEIPOLD: That Met Life immediately distributed to you $7,000.00?

WEST: That is not correct, $7,000.00 for interest. That is when you have an annuity, you are allowed to take ten percent in any given year without paying tax on it. So, that $7,000.00 was taken out of the initial annuity that was put in. You are allowed that in one year.

MR. LEIPOLD: My question to you was, Ma'am, at the time the annuity was purchased in April of 1997—

WEST: Um-hum.

MR. LEIPOLD: For the amount of $70,814.11, is it your testimony that Met Life immediately returned to you a check for $7,000.00 as prepayment of the first year's interest?

WEST: Not interest, no. This is what I am trying to define.

MR. LEIPOLD: This accounting says interest earned $7,000.00

WEST: Well, that evidently when I read it I must have not caught that. It is not interest earned.

MR. LEIPOLD: So, if that is what this says, then Mr. Butler made a mistake?

WEST: Obviously, he did.

N.T., 7/19/2000, at 80–82.

¶ 18 Lanning's counsel again asked West about the discrepancies between her testimony and the accounting provided to Attorney Susan T. James by West's attorney. Lanning's counsel asked West the following:

MR. LEIPOLD: If you follow that transaction chain across, the next entry shows Mellon Bank Certificate of Deposit number 00343530. Do you see that?

WEST: Yes, I do.

MR. LEIPOLD: The reference to that Certificate of Deposit shows an opening date of July 1, 1996, a closing date of April 18, 1997?

WEST: Okay.

MR. LEIPOLD: And, the reference to this certificate also shows a balance of $80,156.62. My question is this, isn't that the C.D. that was cashed in that gave rise to the purchase of the Met Life annuity?

WEST: According to this, yes it is there. But according to the check that [Decedent] received, you know, in our names, I am positive it was for $70,814.00 which was not cashed but just automatically turned into an annuity. I don't know, was there a penalty? Maybe, I don't know.

N.T., 7/19/2000, at 84–85.

¶ 19 After a thorough review of the evidence in this case, it is clear that West's testimony failed to establish by clear, precise and convincing evidence that Decedent gave her the funds in the joint accounts as an *inter vivos* gift. West's testimony also failed to refute Lanning's allegation that West converted the funds to her own use without legal justification. Accordingly, we find that the evidence sufficient to sustain the verdict and that the lower court did not commit an abuse of discretion by denying West's motion for judgment N.O.V.[4]

¶ 20 Next, we consider whether the trial court erred as a matter of law with respect to the burden of proof applied in the determination of the existence of an *inter vivos* gift. West contends that the trial court erred when it stated incorrectly in its opinion of October 12, 2000, the standard for proving an *inter vivos* gift as set forth in *Pappas*. In its Opinion of October 12, 2000, the trial court characterized West's burden as follows:

In cases where gift is claimed as the basis for a transfer, it is the burden of the donee to prove that the transfers were *inter vivos* gifts. The prerequisite elements necessary to prove a valid *inter vivos* gift are donative intent and delivery. *Estate of Korn*, 332 Pa.Super. 154, 480 A.2d 1233 (1984). Initially, the burden is on the alleged donee to prove gift *inter vivos* by clear, precise and convincing evidence. *In re Estate of*

---

**4.** We note that our decision in the present case does not conflict with our recent decision in *In re Falucco*, 791 A.2d 1177 (Pa.Super.2002). In *Falucco*, Decedent Falucco placed funds into joint CDs in her name and that of her son, James, as joint tenants with right of survivorship. James placed the proceeds of the CDs into three accounts titled in his name only. Eventually, Decedent Falucco was adjudicated an incapacitated person, and a guardian was appointed. The guardian caused funds previously held in joint accounts with James to be titled in the name of the guardian alone, for the benefit of Decedent Falucco, and did not include James as a joint tenant with the right of survivorship. Decedent Falucco died testate, and the guardian of the Estate filed an Inventory and First and Final Account of the Estate, which included the funds that were held in joint accounts with James. James filed objections to the inclusion of these assets in the estate, and the trial court found in favor of him. The residuary legatees and the guardian filed exceptions to the trial court's order in favor of James. Later, the trial court dismissed these objections.

On appeal, we upheld the order of the trial court, holding that James had provided sufficient evidence to rebut the presumption created by 20 Pa.C.S.A. § 6303(a) that Decedent Falucco owned all of the funds in the accounts while both parties were alive. We held that Decedent intended to make a testamentary disposition of the funds to James before her death because the funds were titled in their names together immediately before Decedent Falucco made a will and because Decedent Falucco's attorney testified that Decedent Falucco understood that the funds in the joint accounts would not pass under the will. *Id.*, 791 A.2d at 1180. Accordingly, we found in favor of James because these facts demonstrated that Decedent Falucco's opening of the joint accounts with her son, James, was part of her estate plan.

The case before us differs significantly. In this case, there is no question of the intent of the Decedent with respect to whether the funds were an *inter vivos* gift. Here, Decedent's shock and emotional outburst arising from West's actions made it known that she did not intend for the funds to be an *inter vivos gift*, or testamentary disposition. Decedent's desire for Lanning to initiate the conversion suit to reclaim the funds West appropriated bolstered this conclusion. We also note that after Decedent learned of West's actions, she immediately revoked her power of attorney in favor of West and later executed a new will. These facts lead us to the conclusion that the funds in question in this case were not *inter vivos* gifts.

*Pappas,* 428 Pa. 540, 239 A.2d 298 (1968). Further, in order for evidence to be clear, precise and convincing, the "witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Estate of Fickert,* 461 Pa. 653, 337 A.2d 592 (1975).

Trial Court's Opinion, 10/12/2000, at 2–3.

¶ 21 We are constrained to agree with West that the trial court erred as a matter of law when it misstated the burden of proof applied in the determination of the existence of an *inter vivos* gift in its initial opinion of October 12, 2000. The trial court failed to state in its opinion of October 12, 2000, the shifting nature of the burden of proof with respect to *inter vivos* gifts. *See Pappas,* 239 A.2d at 300. (once putative donee establishes *prima facie* case of *inter vivos* gift, burden shifts to contestant to show that transfer was not an *inter vivos* gift). Nevertheless, we fail to see how West was prejudiced by this error. Under *Pappas,* West was required to show a *prima facie* case by clear, convincing and direct evidence that an *inter vivos* gift had occurred before the burden shifted to Lanning to prove that an *inter vivos* gift did not occur. The definition of *prima facie* is "at first sight; on the first appearance but subject to further evidence or information." Black's Law Dictionary 1209 (7th ed.1999). *"Prima facie* evidence" is defined as "evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced."

*Id.* at 579, 239 A.2d 298; *see also Cosmas v. Bloomingdales Bros.,* 442 Pa.Super. 476, 660 A.2d 83, 86 (1995) (defining *prima facie* evidence as "evidence which, standing alone and unexplained, would maintain the proposition and warrant the conclusion"). As shown above, although the trial court misstated the law with respect to the shifting burden of proof, it did utilize the "clear and convincing" standard when it examined the evidence to determine whether an *inter vivos* gift occurred. As a result of its examination, the trial court found that West was unable to show that the funds in the joint accounts were gifts. Accordingly, it would not have been necessary for the trial court to reach the second step of the *Pappas* analysis to determine whether Lanning's evidence rebutted the presumption of a valid *inter vivos* gift in favor of West. Therefore, the trial court's initial misstatement of the law in its opinion of October 12, 2000, was harmless error.[5]

¶ 22 Finally, we turn to West's claim that the verdict was against the weight of the evidence. Our standard of review in "weight of the evidence" cases differs from that of our standard of review in "sufficiency of the evidence" cases. As we explained in *Ditz v. Marshall,* 259 Pa.Super. 31, 393 A.2d 701, 703 (1978):

The general rule for a grant of a new trial on the basis that it is against the weight of the evidence allows the granting of a new trial only when the jury's verdict is contrary to the evidence as to shock one's sense of justice and a new trial is necessary to rectify this situation. Unlike appellate review of a refusal to enter a judgment N.O.V., where the evidence and all reasonable inferences therefrom are viewed in the light most

---

**5.** We also note that the trial court properly enunciated the standard in its opinion of February 21, 2001, when it denied West's motion for judgment N.O.V. The trial court reached the same conclusion as it did on October 12, 2000, with respect to whether Decedent gave West an *inter vivos* gift.

favorable to the verdict winner, the appellate court, in reviewing the refusal to grant a new trial, ordinarily considers all of the evidence. The court is not required to consider the evidence in the light most favorable to the verdict winner when passing on the question of whether a verdict is against the weight of the evidence. Rather, the court is to view all of the evidence.

¶ 23 Moreover, a new trial will not be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the fact-finder could have decided in favor of either party. *S.N.T. Industries, Inc., v. Geanopulos,* 363 Pa.Super. 97, 525 A.2d 736, 740 (1987).

¶ 24 A review of West's motion for post-trial relief indicates that she raised the weight of the evidence issue, but her numbered allegations in fact argue the sufficiency of the evidence. It is clear that West's motion for post-trial relief did not seek the remedy of a new trial, which is the sole remedy where the verdict is alleged to be against the weight of the evidence. *Walsh v. PG & W Co.,* 303 Pa.Super. 52, 449 A.2d 573, 576 (1982) (holding that when a jury returns a verdict against the weight of the evidence, the remedy is to strike the verdict and grant a new trial.) Instead, West raises the "weight of the evidence" claim in the body of her motion for post-trial relief and requests this Court to enter judgment N.O.V. on her behalf. Motion for Post–Trial Relief, 10/26/2000 at 2, 4–5. As shown above, when a party seeks judgment N.O.V., they wish this Court to review the *sufficiency* of the evidence to determine whether the evidence presented sustains the verdict. Consequently, a claim that the verdict was against the *weight* of the evidence cannot be remedied by a directed verdict. We feel that our treatment of the "weight of

the evidence" and "sufficiency of the evidence" claims in *Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super. 475, 448 A.2d 6, 8 (1982) provides us guidance on this issue. In *Dunlap,* Philadelphia Newspapers, Inc., appealed the trial court's verdict that awarded Dunlap compensatory and punitive damages in a defamation suit. *Dunlap,* 448 A.2d at 8. Philadelphia Newspapers, Inc., filed a motion for judgment N.O.V. or, alternatively, a new trial, that was denied by the trial court. On appeal, Philadelphia Newspapers, Inc., sought review of the denial of both the motion for judgment N.O.V. and motion for new trial. *Id.* We reviewed the case under the judgment N.O.V. standard, stating:

> It is true that the standard of review is different depending on whether judgment N.O.V. or a new trial is sought. *Ditz v. Marshall,* 259 Pa.Super. 31, 393 A.2d 701 (1978). Here, we have used the judgment N.O.V. standard, for appellant is primarily seeking a judgment N.O.V. Appellant's Brief at 41 ("The record in this action demonstrates that defendant is entitled to a judgment N.O.V., and at the very least, to a new trial.")

*Dunlap,* 448 A.2d at 8, n. 2.

¶ 25 In the present case, we have already addressed West's sufficiency claim above under the standard of review for appeals from the denial of motions for judgment N.O.V. We see no reason to depart from the reasoning of *Dunlap,* because West seeks only the remedy of judgment N.O.V. and failed to seek the grant of a new trial. *Dunlap's* reasoning is especially persuasive in the present case because, in the *Dunlap* case, we found that we would review the claims of Philadelphia Newspaper, Inc., under the judgment N.O.V. standard, even though they had also sought the remedy of a new trial. Here, West did not request that remedy.

Accordingly, we decline to review West's "weight of the evidence" claim because it cannot be remedied by a judgment N.O.V. As we have already addressed her sufficiency claim and found it to be without merit, we affirm the judgment of the lower court.

¶ 26 Judgment affirmed.

¶ 27 BECK, J. Concurs in the Result.