J-A07035-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| PAUL A. SNADER SR. AND JEANNE M. SNADER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| JACOB A. HUBER AND JOHN HUBER | : | |
| | : | No. 1229 MDA 2017 |
| Appellant | : | |

Appeal from the Order Entered July 10, 2017
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  15-04801

BEFORE:   PANELLA, J., OLSON, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED APRIL 30, 2018**

Appellant Jacob A. Huber appeals from the July 10, 2017, order entered in the Court of Common Pleas of Lancaster County, which granted Appellees Paul A. Snader, Sr., and Jeanne M. Snader's (collectively, "the Snaders") post-trial motion for a new trial.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows:

> On June 4, 2013, Paul [A.] Snader, Sr., ("Mr. Snader") was operating his car southbound on Broad Street in Lititz, Pennsylvania, when he was rear-ended by a vehicle owned by John Huber but being operated by his son, Jacob [A.] Huber [ ]. At the time of the collision, [Mr.] Snader had stopped his car near the intersection [of] West Main Street due to stopped traffic ahead of him.  [Jacob A.] Huber, who was traveling behind [Mr.] Snader's

---

[1] We note that an appeal may be taken as of right from an order entered in a civil action awarding a new trial.  Pa.R.A.P. 311(a)(6).  We further note that, as indicated *infra*, prior to the jury trial, all claims brought against John Huber were dismissed with prejudice.

---

*   Former Justice specially assigned to the Superior Court.

> vehicle, failed to bring his vehicle to a stop prior to striking [Mr.] Snader's vehicle. The force of the collision pushed [Mr.] Snader's stopped vehicle forward causing it to strike the vehicle in front of him that was also stopped.

Trial Court Opinion, filed 9/12/17, at 1-2.

On June 1, 2015, the Snaders commenced this action via a writ of summons. On August 17, 2015, they filed a complaint asserting Mr. Snader suffered "serious injury" because of the accident, and they presented claims of negligence, carelessness, and recklessness against Jacob A. and John Huber. They sought damages for Mr. Snader's past and future lost wages, past and future medical expenses, and pain and suffering. Relevantly, at the time of the accident, Mr. Snader had limited tort motor vehicle insurance coverage as defined by the Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S.A. § 1705.[2] However, Mr. Snader claimed he was entitled to noneconomic damages since he suffered "serious injury" (serious

---

[2] Section 1705 of the MVFRL provides, in relevant part, the following:
> (d) Limited tort alternative.--Each person who elects the limited tort alternative remains eligible to seek compensation for economic loss sustained in a motor vehicle accident as the consequence of the fault of another person pursuant to applicable tort law. *Unless the injury sustained is a serious injury,* each person who is bound by the limited tort election shall be precluded from maintaining an action for any noneconomic loss. . . .

75 Pa.C.S.A. § 1705(d) (emphasis added). There are certain exceptions set forth in Subsection 1705(d); however, none of them are applicable in the case *sub judice*.

impairment of body function) under Section 1702 of the MVFRL.[3] Mrs. Snader asserted a claim for loss of consortium.

Jacob A. and John Huber filed preliminary objections, as a result of which the trial court struck all counts with prejudice against John Huber. Thus, the Snaders' case proceeded solely against Jacob A. Huber, the driver of the vehicle. Jacob A. Huber argued in his answer with new matter that Mr. Snader's injuries were pre-existing and, in any event, he did not suffer a serious injury as defined by the MVFRL. Thus, he argued the Snaders' claim for noneconomic damages was barred by the MVFRL since Mr. Snader had

---

[3] Section 1702 of the MVFRL defines "serious injury" as "[a] personal injury resulting in death, serious impairment of body function or permanent serious disfigurement." 75 Pa.C.S.A. § 1702. With respect to this definition, this Court has relevantly noted:

> The "serious impairment of body function" threshold contains two inquiries:
>
> a) What body function, if any, was impaired because of the injuries sustained in a motor vehicle accident?
>
> b) Was the impairment of the body function serious? The focus of these inquiries is not on the injuries themselves, but on how the injuries affected a particular body function. . . .In determining whether the impairment was serious, several factors should be considered: the extent of the impairment, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious.

**Brown v. Trinidad**, 111 A.3d 765, 770-71 (Pa.Super. 2015) (quotation and citation omitted).

selected the limited tort option when applying for his automobile insurance that was in effect at the time of the accident.

The matter proceeded to a jury trial on June 5, 2017. At the beginning of trial, defense counsel conceded that there was an accident, which resulted entirely due to Jacob A. Huber's negligence. N.T., 6/5/17, at 55. He also conceded that Jacob A. Huber's negligence caused Mr. Snader some bodily injury of a limited duration. *Id.* at 61. Thus, as recognized by defense counsel, the issue presented to the jury was whether Mr. Snader's injury was a "serious injury" such that he could recover noneconomic damages under the MVFRL, as well as whether Mr. Snader had proven any economic damages resulting from the accident. *Id.* at 56 (defense counsel indicating to jury: "We don't agree that he has proven a serious injury. We don't agree he has proven a wage loss because of this accident.").

Mr. Snader, who was fifty-five years old, testified that, from 2011 until the time of the accident, he worked as a forklift operator at Johnson & Johnson Sales & Logistics Company, LLC, and he worked 40 hours per week plus overtime. *Id.* at 67. He earned $26.28 per hour regular time. *Id.* at 69. Mr. Snader testified that, on June 4, 2013, the day of the accident, he was stopped in a line of traffic when Jacob A. Huber's Suburban hit his Ford Escape from behind "hard enough to push [Mr. Snader's Ford Escape] into the car ahead of [him]." *Id.* at 70. Mr. Snader noted that, after the accident, his Ford

Escape was drivable; however, Jacob A. Huber's Suburban was not drivable and had to be towed from the scene. *Id.* at 70-71.

Mr. Snader testified that, as the evening progressed, he began to suffer pain in his back and, by the next morning, he "was in a lot of pain." *Id.* at 71. Accordingly, he went to his family doctor, Paul Vassil, M.D., who prescribed pain medication to Mr. Snader. *Id.* at 72. Mr. Snader remained out of work for the rest of the week (approximately three days); however, he went back to work the next week. *Id.* He indicated that he attempted to work for the next two weeks; however, the pain was "unbearable," even with the use of the prescribed pain medication. *Id.* at 73. Over the next eleven weeks, he sometimes used vacation time and sometimes attended work; however, he was using "a lot of pills," in "pain constantly," and "[i]t just kept getting worse and worse." *Id.* at 75.

In September of 2013, Mr. Snader saw Stanley Porter, M.D., an orthopedic surgeon who had performed a lumbar disk fusion on Mr. Snader in December of 2007. *Id.* at 75-80. Mr. Snader indicated that his surgery in 2007 was "successful" and for the next five years, until the instant accident, he did not take any pain medication. *Id.* at 80-81. Related to his September 2013 examination, Dr. Porter indicated Mr. Snader could not return to work due to his injury, and Mr. Snader began receiving short-term disability benefits. *Id.* at 77. During the next four months, Mr. Snader remained out

of work, continued under the care of Dr. Porter, and received physical therapy. *Id.* at 77-79.

In January of 2014, Dr. Porter referred Mr. Snader for pain management. *Id.* at 82. In January and February of 2014, Mr. Snader received a series of back injections, which were performed in a surgical setting. *Id.* After the injections, he began to feel better and returned to work; however, after a month, the pain returned, and he was unable to work. *Id.* at 83. On April 1, 2014, Mr. Snader had an ultrasound ablation, which is the burning of the nerves to desensitize them, performed in a surgical setting. *Id.* This provided Mr. Snader with some pain relief, and he returned to work for a short time. *Id.* at 84. However, the pain returned, and Mr. Snader saw a neurosurgeon who issued Mr. Snader a disability slip. *Id.* at 85.

In April of 2014, Mr. Snader began receiving long-term disability benefits, and he has not worked in any capacity since that time. *Id.* at 84-85. Mr. Snader testified that, since he left work in April of 2014, he is in constant back pain, takes pain medication, and feels his condition is worsening. *Id.* at 85-87. He testified as to the activities he no longer enjoys, including riding bikes, playing ball with his son, walking, hiking, and canoeing. *Id.* at 88. He indicated that he lies on the couch "quite a bit" and feels his future is bleak. *Id.* at 87, 90.

Mrs. Snader testified that, since the accident, Mr. Snader has been in physical and mental anguish. *Id.* at 98. She testified that he is unable to

"do what he used to do. He lives like a 98-year-old man." *Id.* at 99. She testified that Mr. Snader is unable to travel or keep social engagements. *Id.* at 101-02. She noted that he "loved his job" and misses not being able to work because of his back pain. *Id.* at 99.

Alexander R. Vaccaro, M.D., Ph.D., an orthopedic spine surgeon, testified that he examined Mr. Snader on October 6, 2015. Videotaped Deposition of Dr. Vaccaro, 5/25/17, at 12.[4] Mr. Snader complained of back pain radiating into his buttocks and down his right leg, as well as numbness. *Id.* at 13. Dr. Vacarro testified that when he examined Mr. Snader on October 6, 2015, Mr. Snader walked with an unsteady gait due to his back and leg pain, and he had a decreased range of motion. *Id.* at 42-43.

He noted Mr. Snader had a "successful" prior lumbar disk fusion in 2007. *Id.* at 14. He testified that he examined all of Mr. Snader's medical records, including imaging studies taken after the accident. *Id.* at 15. He indicated that the MRI[5] scans revealed:

> [Mr. Snader had] degenerative disc disease in the upper level, L1-2 and L2-3. There was evidence of a fusion at the L5-S1 level. He had moderate right foraminal stenosis, that means where the nerve comes out on the right side at the L3-4 level, and then you could see the previous surgery, which is scar tissue, at the L5-S1 level.

---

[4] By stipulation, Dr. Vacarro's videotaped deposition was played for the jury. N.T., 6/5/17, at 107.

[5] "MRI" refers to magnetic resonance imaging.

*Id.* at 43. Dr. Vacarro testified that the narrowing, which he observed on the MRI, compressed a nerve root in Mr. Snader's back. *Id.* at 44. He testified, to a reasonable degree of medical certainty, Mr. Snader's ongoing low back pain was due to "symptomatic multilevel degenerative disc disease," which was caused by the traumatic accident on June 4, 2013. *Id.* at 46-47. He noted that the success rate of surgery for this type of injury is "often poor;" he determined Mr. Snader is totally disabled from work. *Id.*

Dr. Vacarro testified that he additionally examined Mr. Snader on May 23, 2017, and Mr. Snader continued to have subjective complaints of pain. *Id.* at 50. He noted Mr. Snader continued to display a decreased range of motion, and his prognosis for Mr. Snader is "extremely poor." *Id.* at 52, 58.

Paul E. Vassil, M.D., a board-certified family practice physician, confirmed Mr. Snader is his patient, and he examined Mr. Snader on June 5, 2013, the day after the accident. Videotaped Deposition of Dr. Vassil, 6/2/17, at 15.[6] He noted Mr. Snader developed back pain rather quickly after the accident, and he "took Mr. Snader out of work at that time." *Id.* at 17-18. Mr. Snader returned to work on June 10, 2013; however, on June 24, 2013, he returned to Dr. Vassil's office due to pain, and he "was placed off work as a result of that visit." *Id.* at 20. On September 16, 2013, Mr. Snader returned to Dr. Vassil's office, complaining of low back pain and displaying limited

---

[6] By stipulation, Dr. Vassil's videotaped deposition was played for the jury. N.T., 6/6/17, at 126.

flexibility. *Id.* at 23-24. At this point, Dr. Vassil referred Mr. Snader to Dr. Porter, who kept Mr. Snader out of work until January 2014. *Id.* at 26-27. Dr. Vassil confirmed that, thereafter, Mr. Snader received two rounds of injections and underwent an ablation procedure; however, he concluded the treatments did not offer Mr. Snader any lasting pain relief. *Id.* at 28.

On March 21, 2014, Dr. Vassil examined Mr. Snader, who continued to complain of pain. *Id.* at 31. Dr. Vassil "took him out of work," and Mr. Snader returned to Dr. Vassil's office on April 28, 2014. *Id.* at 32. Dr. Vassil concluded Mr. Snader was "disabled from being able to work in his job as of that time" due to the June 4, 2013, accident. *Id.* at 33-34. Dr. Vassil noted that, since the time of the accident until present, Mr. Snader has displayed mobility issues to the point that Dr. Vassil is concerned Mr. Snader will lose his balance. *Id.* at 37. He noted in his September 18, 2015, report that, other than sitting occasionally, Mr. Snader was able to do most other activities "zero or one percent of the time." *Id.* at 40. He opined that, from September 2015 until present, Mr. Snader's work capacities have not improved and, in fact, they may have worsened. *Id.* at 43. He noted that he issued Mr. Snader a handicap placard, and he opined that Mr. Snader is totally and permanently disabled from working his job. *Id.* at 43, 46. His opinion was based on Mr. Snader's "very limited functional capacity[.]" *Id.* at 45. He opined to a reasonable degree of medical certainty that the June 4, 2013, accident was a "critical point at which [Mr. Snader's] condition changed," and he testified Mr.

Snader's back pain and inability to work were caused by the accident. *Id.* at 5-53. He opined Mr. Snader has "suffered a serious impairment of a body function, that body function being his low back, as a result of the accident[.]" *Id.* at 55.

Andrew Verzilli, MBA, testified that he is an economist who analyzes a person's loss of earnings and earning capacity following an event. N.T., 6/6/17, at 128. He confirmed that he assessed Mr. Snader's loss of earnings and earning capacity resulting from the June 4, 2013, accident. *Id.* at 134. He concluded that Mr. Snader's pre-injury earning capacity was approximately $57,766.00 per year. *Id.* at 140. He concluded that Mr. Snader's injury-related past lost earnings was $98,067.00. *Id.* at 140-41. With regard to Mr. Snader's future loss of earning capacity, Mr. Verzilli opined the future loss was $444,000.00. *Id.* at 149.

At this point, the Snaders introduced evidence that Mr. Snader's accident-related medical bills are $19,445.36. *Id.* at 180.

Jacob A. Huber presented a sole witness at trial, S. Ross Noble, M.D., a physical medicine and rehabilitation physician. Videotaped Deposition of Dr. Noble, 5/30/17, at 5.[7] Dr. Noble confirmed that he conducted an independent examination of Mr. Snader on May 18, 2017, as well as reviewed his medical records. *Id.* at 7-8. Dr. Noble indicated Mr. Snader revealed that his vehicle

---

[7] By stipulation, Dr. Noble's videotaped deposition was played for the jury. N.T., 6/6/17, at 182.

had been rear-ended by a Suburban on June 4, 2013, and since that time, he has been in severe pain and unable to work.  *Id.* at 9.

With regard to his examination of Mr. Snader, Dr. Noble noted that he initially observed Mr. Snader when he was in the waiting room.  *Id.* at 10.  At this time, Mr. Snader was in a "crouched position on the floor, his hips were bent all the way, his knees were bent all the way, his ankles were bent all the way, his neck was bent down, and he was looking at the floor."  *Id.*  He noted that Mr. Snader was able to stand "smoothly," but that his walking pattern was "abnormal."  *Id.* at 11.

Upon examination of Mr. Snader in the examining room, Dr. Noble concluded Mr. Snader had a normal range of motion; however, his hands-on examination of Mr. Snader's lumbar revealed "tight or increased tone, which is indicative of a low level of physical activity."  *Id.* at 13.  He noted that, upon palpitation of Mr. Snader's back, Mr. Snader complained of pain.  *Id.*  He concluded that Mr. Snader had an objectively normal physical examination with subjective findings.  *Id.* at 15.

Dr. Noble noted that Mr. Snader received treatments for his back prior to 2007, and on December 4, 2007, he underwent lumbar surgery.  *Id.* at 17-18.  He noted that Mr. Snader reported improvement after the surgery and returned to his work.  *Id.* at 18.

He acknowledged that on June 5, 2013, the day after the accident, Mr. Snader reported to his family doctor that he was experiencing acute low back

pain, and the doctor prescribed medication, as well as the use of heat and ice. *Id.* Dr. Noble admitted "it's fair to say that following this motor vehicle accident of June 4, 2013[,] Mr. Snader had acute low back pain[.]" *Id.* He further admitted that, on June 24, 2013, Mr. Snader returned to his family doctor, reporting the pain had become more intense. *Id.* Dr. Noble indicated Mr. Snader was prescribed pain medication, which appeared to help control Mr. Snader's pain since, at a follow-up visit on June 28, 2013, he reported feeling "70 percent better." *Id.* He noted that Mr. Snader did not return for treatment of his acute low back pain until September 16, 2013. *Id.* at 19.

Dr. Noble acknowledged that, on September 30, 2013, Dr. Porter, an orthopedic surgeon, examined Mr. Snader, who reported "sharp, dull, aching, and constant" back pain. *Id.* at 20. He noted that Mr. Snader returned to his family doctor in February of 2014, at which time he was prescribed medication for chronic back pain. *Id.* at 21. Dr. Noble noted that, at a follow-up appointment on March 3, 2014, Mr. Snader reported he "felt he was 99 percent back to his normal[,]" and he was released to go back to work. *Id.* However, he acknowledged that Mr. Snader returned to his family doctor on March 21, 2014, complaining of low back pain, at which point he was referred to a neurosurgeon. *Id.*

Dr. Noble indicated he reviewed medical reports from May 21, 2015, July 17, 2015, September 18, 2015, and October 29, 2015. *Id.* With regard to these visits, Mr. Snader complained of low back pain. *Id.* He indicated

there was a notation in the July 17, 2015, report that Mr. Snader had degenerative disk disease, which, in his opinion, should not have been causing the level of pain complained of by Mr. Snader. *Id.*

Dr. Noble testified that Doctor Porter informed Mr. Snader that he did not need to have surgery, and he indicated that Dr. Porter referred Mr. Snader for pain management. As of March 4, 2016, the pain management specialist noted "tenderness to the low back with fairly light palpitation[,]" and "the physical examination included actual kneeling on the floor, which he had done at the previous appointment, he was hunched forward, flexed, and kneeling on the floor, which [Mr. Snader] stated was his most comfortable position." *Id.* at 22-23. Dr. Noble noted this was consistent with his observation and examination of Mr. Snader on May 18, 2017. *Id.* at 23. He noted that a neurosurgeon evaluated Mr. Snader in May of 2014, and despite the fact Mr. Snader reported "chronic spasm and low back pain," the neurosurgeon did not recommend lumbar surgery. *Id.*

Dr. Noble testified he reviewed Mr. Snader's lumbar MRI from October 19, 2013. *Id.* He testified "[t]here were post-surgical changes consistent with his surgical history in December of 2007, as well as degenerative changes, but there were no acute traumatic changes or abnormalities referable to the June 4, 2013, motor vehicle accident." *Id.* at 24. As to Mr. Snader's physical condition and diagnosis, he opined the following:

The diagnosis based on the information available to me are status post-L5-S1 fusion performed on December 4[,] 2007 by Doctor Porter.

My second diagnosis, degenerative disk and joint disease of the lumbar spine aggravated by chronic daily tobacco use.

My third diagnosis, excessive subjective complaints.

And my fourth diagnosis, status post-low back strain as a result of the June 4, 2013[,] motor vehicle accident.

*Id.* He testified that he was unable to explain either the intensity of Mr. Snader's complaints of pain or the unusual movement that he observed on May 18, 2017. *Id.* The relevant exchange occurred between Dr. Noble and Jacob A. Huber's counsel:

**Q:** Doctor, in your opinion[,] did Mr. Snader sustain an injury as a result of the June 4, 2013[,] motor vehicle accident?

**A:** Yes, he did. I base that on the severity of impact described by Mr. Snader as a slam and a high impact. I based that on his obtaining medical care the next day with his family doctor and subsequent follow-up over the next month. I believe the diagnosis is to be lumbar strain and soft tissue injury to the spine as a result of the impact.

*Id.* at 24-25.

Although Dr. Noble admitted that Mr. Snader was injured in the June 4, 2013, accident, he testified that the accident had no effect on the fusion surgery performed on Mr. Snader in 2007. *Id.* at 25. He opined that, as of May 18, 2017, when he examined Mr. Snader, Mr. Snader was "fully recovered" from the injuries he sustained almost four years earlier in the automobile accident. *Id.* Further, he opined Mr. Snader would not require future treatment from the injuries he received in the accident, and there was

no basis to limit Mr. Snader's future work activity. *Id.* When asked what could be the cause of Mr. Snader's back pain, if in fact he was still experiencing pain as of the time of trial, Dr. Noble testified:

> I think that the cause of Mr. Snader's back pain to the extent that there is a medical cause relates to his age. He's over fifty-five. He's been a smoker for many years. He has degenerative changes on [his] lumbar MRI. He was born with a particular defect at the bottom of his back for which he underwent surgery in 2007 by Doctor Porter. He also has a history of a physically demanding work activity with associated low back pain.
>
> Those are the factors I believe are medical to the extent there's a medical cause for Mr. Snader's low back pain, not the single impact of the June 4, 2013[,] motor vehicle accident.

*Id.* at 26.

At the conclusion of all testimony, the trial court presented the jury with a verdict slip, which included a pre-checked "Yes" to the following questions: "1. Was Defendant Jacob A. Huber negligent?" and "2. Was the negligence of Defendant Jacob A. Huber a factual cause of any injury to Plaintiff Paul A. Snader?"[8] Jury's Verdict Slip, filed 6/7/17, at 1.

Consequently, the verdict slip left open for the jury to decide the following Question: "3. Did Plaintiff Paul Snader sustain a serious impairment

---

[8] Jacob A. Huber objected at trial to the trial court presenting the verdict slip to the jury with a pre-checked "Yes" as to Question Number 2. *See* N.T., 6/7/17, at 276. In response, the trial court indicated that "based upon the testimony, [the] issue has been acknowledged by the defense expert. The amount, of course, of damages, if any, is an issue, but there was at least some factual cause for damages." *Id.* Jacob A. Huber did not, thereafter, file a post-sentence motion claiming error in this regard.

of bodily function?" *Id.* The verdict slip indicated that, if the jury answered

"Yes" to Question Number 3, the jury's verdict was against Defendant Huber

and for Plaintiffs Paul and Jeanne Snader; the jury was to then proceed to

determine Question Numbers 4, 5, and 6, which provided the following:

> 4. For each of the categories listed below, please state the amount
> of money damages, if any, sustained by Plaintiff Paul A. Snader.
> Then add up all of amounts entered and place that amount on the
> line marked "Total."
>
> Past, present and future pain and suffering    $ _____
>
> Loss of ability to enjoy the pleasures of life    $ _____
>
> Embarrassment and humiliation    $ _____
>
>             TOTAL:    $ _____
>
> 5. State the total amount of damages, if any, to Plaintiff Jeanne
> M. Snader caused by Defendant's negligence for loss of
> consortium:    $ _____
>
> 6. State the total amount of economic damages, if any, you award
> to Plaintiff Paul A. Snader caused by Defendant Jacob A. Huber's
> negligence:
>
> Past, present and future lost wages    $ _____
>
> Past medical expenses    $ _____
>
>             TOTAL:    $ _____

*Id.* at 1-2.

The verdict slip indicated that, if the jury answered "No" to Question

Number 3, the jury was to skip Question Numbers 4 and 5, and proceed to

Question Number 6. *See id.*

The jury returned its verdict on June 7, 2017. The jury answered "No"

to Question Number 3, *supra*, then skipped Question Numbers 4 and 5, *supra*,

and proceeded directly to Question Number 6, *supra*. With regard to economic damages as set forth in Question Number 6, the jury awarded Mr. Snader $105,000.00 for "past, present and future lost wages," as well as $15,000.00 for "past medical expenses." **Id.** at 2. Thus, the jury awarded the Snaders a total of $120,000.00 for economic damages. The jury did not award any noneconomic damages.

On June 16, 2017, the Snaders filed a timely post-trial motion seeking a new trial as to damages only. Specifically, they averred, in relevant part, the following:

4. The jury found that Mr. Snader suffered past, present, and future wage loss caused by the accident in the amount of $105,000.00.

5. The jury also found that Mr. Snader incurred past medical expenses as a result of this accident in the amount of $15,000.00, resulting in a total verdict in favor of [the Snaders] in the amount of $120,000.00.

6. The jury also found from the same evidence that Mr. Snader did not suffer a serious impairment of body function; thereby precluding any damages for pain and suffering by virtue of Mr. Snader's limited tort selection; 75 Pa.C.S.A. §§ 1705, 1702.

7. [Mr. Snader's] wage loss evidence came from the testimony of Paul Snader, the testimony of Jeanne Snader, the testimony of Mr. Snader's doctor, Paul Vassil, M.D., the testimony of expert medical witness, Alexander Vacarro, M.D., Ph.D., and the testimony of expert economist, Andrew Verzilli, M.B.A. Mr. Verzilli summarized Mr. Snader's lost wages from the time of the accident to the time of trial at $98,067.00.

8. The jury determined from the weight of the lay, medical[,] and expert evidence that Mr. Snader's accident-related injuries were severe enough to physically impaired [*sic*] him to the point that he was completely disabled from his work as a warehouseman/forklift operator or in any alternate capacity, for a period in excess of three (3) years.

9. In light of the jury's determination that Paul Snader suffered accident-related injuries that impaired him from working in his occupation or any alternate occupation for a period in excess of three (3) years, the jury's determination that Paul Snader did not suffer a serious impairment of body function is, respectfully, against the weight of the evidence.

10. To prevail on a challenge to the weight of the evidence, the verdict must be contrary to the evidence as to shock one's sense of justice, and a new trial is necessary to rectify the situation. ***Lanning v. West***, 803 A.2d 753, 765 (Pa.Super. 2002).

11. A new trial is the sole remedy where the verdict is against the weight of the evidence. ***Id.***, citing ***Walsh v. PG & W Co.***, 449 A.2d 573, 576 (Pa.Super. 1982).

12. Th[e] [trial] court is requested to grant [the Snaders'] motion for a new trial limited to the issue of damages, as the jury's determination that Paul Snader did not suffer a serious impairment of body function as a result of this accident, where that jury found Mr. Snader was physically impaired from his occupation as a warehouseman/forklift operator or any alternate occupation for a period in excess of three (3) years as a result of this accident, respectfully, shocks one's sense of justice.

13. Because the jury's determination that Paul Sander [*sic*] did not suffer a serious impairment of body function is against the weight of the evidence that he was physically impaired from working for in excess of three (3) years, a new trial on the issue of damages is necessary.

Snaders' Post-Trial Motion, filed 6/16/17, at 2-3.

Jacob A. Huber did not file a post-sentence motion presenting any claims of error; however, he filed a response to the Snaders' post-trial motion.

By order entered on July 10, 2017, the trial court granted the Snaders' request for a new trial. However, the trial court denied the Snaders' request that the new trial be limited to the issue of damages only. Jacob A. Huber

filed a timely notice of appeal,[9] and the trial court ordered him to file a Pa.R.A.P. 1925(b) statement. Jacob A. Huber timely complied and presented the following sole issue:

> The [t]rial [c]ourt erred and abused its discretion in awarding a new trial on the basis that the verdict was against the weight of the evidence, when the jury's determination that [Mr. Snader] had sustained lost wages and medical expenses but had not suffered a "serious injury" sufficient to pierce the limited tort threshold was supported by the evidence and represented a proper balancing of the conflicting evidence presented to the jury at trial.

Huber's Pa.R.A.P. 1925(b) Statement, filed 8/23/17. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion on September 12, 2017. Therein, the trial court relevantly indicated the following:

> The jury found [Mr.] Snader suffered past, present and future wage loss caused by the accident in the amount of $105,000.00. The jury also found that [Mr.] Snader incurred past medical expenses as a result of the accident in the amount of $15,000.00, resulting in a total verdict in favor of the Snaders in the amount of $120,000.00. The jury determined from the same evidence that [Mr.] Snader did not suffer a serious impairment of body function; thereby, precluding any damages for pain and suffering by virtue of [Mr.] Snader's limited tort selection. **See** 75 Pa.C.S.A. §§ 1705, 1702.
>
> ***
>
> Reasonable minds could not differ here as to the presence of a serious impairment of a body function, as [Mr. Snader's] injury rendered him unable to work for four years, as acknowledged by the jury['s] [award of damages for lost wages]. Because the jury's verdict did not bear a reasonable resemblance

_____

[9] The Snaders did not file an appeal as to the portion of the trial court's order denying their request that the new trial be limited to the issue of damages only. Further, although Jacob A. Huber contends the trial court erred in awarding the Snaders' a new trial, he does not aver the scope of any new trial should be limited to the issue of damages.

to the "serious injury" proved, [it was proper for the trial court] to reverse the jury's conclusion and grant a new trial.

Trial Court Opinion, filed 9/12/17, at 4, 16.

On appeal, Jacob A. Huber contends the trial court abused its discretion in concluding the jury's verdict is against the weight of the evidence and, thus, ordering a new trial. In this vein, he notes that Mr. Snader, who elected the limited tort option, was required to establish that he sustained a "serious injury" (serious impairment of body function) in order to receive noneconomic damages. Mr. Huber argues the jury was presented with conflicting evidence regarding whether Mr. Snader suffered a serious injury, and the fact the jury chose to believe some, but not all, of the evidence presented by each party does not render the jury's verdict (finding no serious injury) to be against the weight of the evidence. He further argues the fact the jury awarded $120,000.00 for lost earnings and medical expenses, but no damages for pain and suffering associated therewith, does not result in a conclusion that the verdict is against the weight of the evidence.

Our standard of review for weight of the evidence claims is well-settled:

> The decision of whether to grant a new trial is within the sound discretion of the trial court. We will not disturb the trial court's decision unless the court palpably abused its discretion or committed an error of law. In evaluating an order awarding a new trial, we keep in mind that a new trial is warranted where the jury's verdict is so contrary to the evidence as to shock one's sense of justice. However, a new trial should not be granted because of a mere conflict in testimony or because the trial judge, on the same facts, would have arrived at a different conclusion.

***Peterson v. Shreiner***, 822 A.2d 833, 836 (Pa.Super. 2003) (quotation

omitted).

> Our Supreme Court [has] acknowledged that [while] the jury is free to believe all, part, or none of the evidence,. . .this principle is tempered by the notion that the verdict cannot be a product of passion, prejudice, partiality, or corruption, or must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by uncontroverted evidence presented at trial. The synthesis of these conflicting rules is that a jury is entitled to reject any and all evidence up until the point at which the verdict is so disproportionate to the uncontested evidence as to defy common sense and logic.

***Neison v. Hines***, 539 Pa. 516, 653 A.2d 634, 637 (1995) (citations omitted).

> Under [ ] circumstances, where the trial court has specifically enumerated the reasons on which it based its grant of a new trial, we may examine only those stated reasons to determine whether they may be supported by the record. Where the record adequately supports the trial court's reasons and factual basis, there is no abuse of discretion; however, if the record discloses that evidence was merely conflicting, the new trial order must be reversed.

***Hobbs v. Ryce***, 769 A.2d 469, 473 (Pa.Super. 2001) (citations omitted).

Applying our standard of review, we find the trial court did not abuse its discretion in concluding that the jury's finding of no "serious injury," and its failure to award any noneconomic damages, was against the weight of the evidence. ***See Peterson***, ***supra***.

Here, at trial, Jacob A. Huber conceded the accident was caused solely by his negligence and that his negligence caused some injury to Mr. Snader. Thus, the issue submitted to the jury was whether the injury sustained by Mr. Snader was a "serious injury" (serious impairment of a body function) such

that he could receive an award for pain and suffering, as well as whether he suffered any economic damages in connection with the accident.

There is no question the jury determined that Mr. Snader suffered some compensable injury from the motor vehicle accident (as opposed to no injury) as it awarded him $105,000.00 for wage loss and $15,000.00 for medical expenses. However, we agree with the trial court that the economic damages awarded in the instant case, and in particular the damages for wage loss, are based on evidence that also established Mr. Snader suffered a serious impairment of a body function (his lower back). In this vein, we note Mr. Snader, Mrs. Snader, and Mr. Snader's physicians/expert witnesses testified that Mr. Snader was unable to work due to the severe low back pain he suffered from the accident. They also testified to the corrective treatments, extent of Mr. Snader's impairment, and other factors relevant to his impairment. *See Brown*, *supra*. The uncontradicted testimony established that, as of the time of trial, Mr. Snader had $98,067.00 in lost wages.

Jacob A. Huber's sole witness, Dr. Noble, admitted that "it's fair to say that following this motor vehicle accident of June 4, 2013[,]" Mr. Snader had acute low back pain[.]" Videotaped Deposition of Dr. Noble, 5/30/17, at 18. He also admitted that Mr. Snader suffered a "lumbar strain and soft tissue injury to the spine as a result of the impact." *Id.* at 25. While Dr. Noble disputed the length of time Mr. Snader's injury should have caused him pain and corresponding absences from work, he did not dispute that Mr. Snader

reasonably suffered pain, missed some work, and underwent corrective treatments because of the lower back injury that he sustained in the accident.

As the trial court recognized, Mr. Snader's lost wages were not separable from his serious impairment of a body function; it was the result of the serious impairment. Therefore, in choosing to award Mr. Snader lost wages, the jury necessarily had to believe that Mr. Snader experienced a serious impairment, as well as some noneconomic damages associated therewith. Yet, it gave him no award for those noneconomic damages. **See Hobbs**, **supra** (holding the jury's award must bear a reasonable relationship to the loss suffered). Accordingly, we conclude the trial court did not abuse its discretion in finding that the jury's verdict is against the weight of the evidence, thus warranting a new trial.[10] Thus, we affirm.

Affirmed.

Judge Panella joins the memorandum.

Judge Olson concurs in the result.

_____

[10] Jacob A. Huber argues the trial court applied an improper standard in determining whether the jury's verdict was against the weight of the evidence. We disagree and specifically note the trial court set forth the proper standard in its opinion. **See** Trial Court Opinion, filed 9/12/17, at 5.

- 23 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>04/30/2018</u>